# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-01105-SCT

*THE PRUDENTIAL INSURANCE COMPANY OF AMERICA AND PRUCO LIFE INSURANCE COMPANY*

*v.*

*PATTY STEWART, SALLY STEWART HESTER, GILES STEWART, LARRY STEWART, INDIVIDUALLY, AS CO-EXECUTORS OF THE ESTATE OF EDSEL STEWART; AND LARRY STEWART AND GILES STEWART AS CO-TRUSTEES OF THE STEWART FAMILY LIFE INSURANCE TRUST*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/2006 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ROY H. LIDDELL |
| | WALTER D. WILLSON |
| | RICHARD GERALD NORRIS, II |
| ATTORNEYS FOR APPELLEES: | ALEX A. ALSTON, JR. |
| | SHELDON G. ALSTON |
| | SHARON F. BRIDGES |
| | ELIZABETH LEE DECOUX |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND RENDERED - 09/27/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1.    This action was instituted in the Circuit Court for the First Judicial District of Hinds County against Defendants Prudential Insurance Company of America, Pruco Life Insurance, James Bateman, and JMB Financial Group to recover proceeds from a life insurance policy allegedly due to the Plaintiffs, Patty Stewart, Sally Stewart Hester, Giles Stewart, and Larry Stewart, individually and as co-executors of the Estate of Edsel Stewart; and Larry Stewart and Giles Stewart as co-trustees of the Stewart Life Insurance Trust. The jury awarded compensatory and punitive damages to the Plaintiffs. The Plaintiffs filed a motion for attorneys' fees and costs, which the trial court granted. The trial court entered a judgment against the Defendants, Prudential and Pruco (collectively "the Defendants," or "Prudential") in the amount of $1,400,000 in compensatory damages, $35,000,000 in punitive damages, and $501,638.02 in attorneys' fees, for a final judgment of $36,901,638.02, at an 8% annual interest rate.[1] The Defendants filed a motion for judgment notwithstanding the verdict (J.N.O.V.), or in the alternative, motion to alter, amend and vacate the judgment, or for remittitur, which the court denied. The Defendants now appeal to this Court.

**FACTS**

¶2.    Dr. Edsel Stewart (Dr. Stewart) retained James Bateman (Bateman), an independent broker, to handle estate planning and to procure a life insurance policy in the amount of $1,000,000 to cover the expected tax liabilities of approximately $1,000,000.[2] Several

---

[1] The Prudential Insurance Company of America and Pruco Life Insurance Company were the only two defendants who appealed the judgment to this Court.

[2] Dr. Stewart was 73 years old at the time he died.

2

companies declined to cover Dr. Stewart due to his advanced age or agreed to consider providing coverage at a premium rate that Dr. Stewart deemed too high. Dr. Stewart's son, Dr. Larry Stewart (Larry), was the trustee of Dr. Stewart's trust and was involved with his father's procurement of life insurance. The "beneficiaries/ownership" listed in the application was The Stewart Family Life Insurance Trust (Trust), Lawrence Edsel Stewart, Trustee. ***Larry, as the trustee, signed the application as the "applicant" on the policy. Dr. Stewart was not listed as the applicant on the application.*** Dr. Stewart signed the application as the "proposed insured."

¶3.     The Plaintiffs contend that by August 19, 1999, Prudential communicated an offer to Dr. Stewart, the insured, and Larry, the trustee of the trust established to receive the insurance proceeds on Dr. Stewart's death. The Plaintiffs assert that on August 31, 1999, the offer had been accepted and $20,000 was paid as the first payment on the annual premium. Bateman testified that the $20,000 check issued to Bateman's company, JMB Financial Group, was for two years of estate planning provided to Dr. Stewart, and it was not a premium payment on any insurance coverage. Only Dr. Stewart and Bateman were present when the $20,000 check, dated August 31, 1999, from the bank account of Dr. or Mrs. Edsel Stewart, indicating for a "*fee*," was tendered to JMB Financial Group. The check stated that it was payable to the order of "JMB Financial Group."

¶4.     On September 1, 1999, Dr. Stewart had a stroke and fell into a coma. On September 9, 1999, Larry received a faxed document from Bateman that needed his signature. Larry signed and approved the "Supplement to the Application" form. The document stated that

3

it was, "A Supplement to the Application for a variable contract in which Edsel Ford Stewart is named as the proposed insured." It directed, "Use this form to provide additional information needed in connection with the purchase of a variable life insurance product." The "Supplement to the Application" was signed by Larry, as the applicant, was dated September 10, 1999, and contained the application number V1016075.[3] Larry did not inform Bateman that Dr. Stewart had had a stroke and was now in a coma and had been in a coma since September 1, 1999. Larry established a conservatorship over Dr. Stewart on September 9, 1999.

¶5.    According to the Defendants, on September 17, 1999, Pruco issued a policy that differed from the policy face amount of $1,000,000 applied for by Dr. Stewart.[4] The policy required an annual premium of $105,000, not $100,000 as requested in the Trust's application. Prudential and Bateman maintain that they were never notified of any change in Dr. Stewart's health before the policy was issued on September 17, 1999. The policy was

---

[3] The document was signed on September 10, 1999, by Lawrence E. Stewart, as the applicant.

[4] Prudential considered the changes in the policy issued as a counteroffer to Dr. Stewart's application. Prudential asserts that the Trust made an offer to Pruco on August 23, 1999, in the form of the application for a variable life policy with a face amount of $1,000,000 at a premium of $100,000. On September 1, 1999, unbeknown to Prudential, Dr. Stewart, the proposed insured, had a stroke and was comatose. On September 17, 1999, Pruco issued a policy that would have been a counteroffer, if it had been communicated or delivered, because it contained an annual premium $5,000 higher than that listed on the application.

4

delivered to Bateman with delivery instructions and restrictions. The instructions to the agent stated:

> When ***delivering the policy you must personally see the proposed insured, verify that all answers to the questions on the application are unchanged, and collect the first full premium***. ***If the answer to any question has changed***, ***or*** if any person covered under the contract is ***ill, disabled, has died***, or has been put in an institution or prison, ***do not deliver it.***

(Emphasis added).

¶6.    The contract date of the policy provided, "Coverage is effective on _____ (the effective date), that is the date the initial premium was paid and the contract was delivered." On September 20, 1999, Prudential sent Bateman the policy, airborne, for Bateman to attempt delivery and satisfaction of the outstanding placement requirements. On ***September 21, 1999***, Bateman attempted to contact Dr. Stewart. When Bateman could not locate Dr. Stewart, he contacted Larry and asked him to arrange a meeting with Dr. Stewart. Larry asked Bateman to fax or mail the policy to him rather than have a meeting. Bateman informed Larry that he was required personally to see Dr. Stewart and obtain a signed statement from him that his health was unchanged since the application process. The call ended with no meeting arranged.

¶7.    On ***September 22, 1999***, Larry contacted Bateman and inquired again about the delivery of the policy, informing him for the first time that Dr. Stewart was in a coma. Bateman told Larry that he had the policy, but he could not, under the circumstances of the changes in Dr. Stewart's health, deliver the policy. He informed Larry that there would be no insurance. On September 22, 1999, Bateman informed Prudential that Dr. Stewart was

5

in a coma. Prudential requested Bateman return the policy with no attempt to place it. At trial, Larry testified that neither he, nor anyone else to his knowledge, informed Prudential before September 21, 1999, that Dr. Stewart was in a coma until he told Bateman. Larry stated that he agreed that an insurance company considering issuing insurance on an individual would be interested in knowing whether or not the individual was in a coma. Larry testified that the written policy was not in the possession of the Trust when Dr. Stewart went into a coma.

¶8.     Dr. Stewart died on *October 19, 1999*. The Plaintiffs contend that Larry, via an attorney, sent a demand letter to Prudential on February 18, 2002, demanding that $1,000,000 be paid. The letter enclosed Dr. Stewart's death certificate and contained Dr. Stewart's social security number and all the details of the claim. The Plaintiffs assert that Prudential signed a return receipt. Receiving no response, Larry faxed another notice to the Claims Department of Prudential on April 5, 2002.

¶9.     Prudential claims that on June 18, 2002, it received a letter from Larry demanding policy benefits, claiming a premium had been paid for the policy, and attaching the February and April 2002 correspondence, which Prudential contends it had never seen until that day. Prudential asserts that it responded to the letter three days later and began its investigation. Prudential also sent a request to Larry that he provide documentation that he represented the legal interests of the decedent. Prudential received no response until August 28, 2002. The Plaintiffs filed suit on September 24, 2002.

**DISCUSSION**

6

¶10.    A review of the record in this case reveals that a contract for insurance was never formed, and therefore, no life insurance policy was in effect.  Accordingly, we find that the trial court's denial of the Defendants' motion for J.N.O.V. to be error.  When considering a trial court's denial of a motion for judgment notwithstanding the verdict, the standard of review is *de novo*.  ***Poole v. Avara,*** 908 So. 2d 716, 726 (Miss. 2005).  The trial court must view the evidence in the light most favorable to the non-moving party and look only to the sufficiency, and not the weight of the evidence.  ***Id.*** at 727.  When determining whether the evidence was sufficient, the critical inquiry is whether the evidence is of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions.  ***Id.*** at 726.

¶11.    When evaluating the denial of a motion for new trial, this Court will overturn the trial court only if it abused its discretion in that it denied a new trial though the verdict was against the overwhelming weight of the evidence.  ***Id.*** at 727.  We will not order a new trial unless we are convinced that the verdict was contrary to the substantial weight of the evidence so that justice requires that a new trial be granted.  ***Id.***

¶12.    The issue before us is whether a contract was ever formed between the trust and Prudential Life Insurance for life insurance on Dr. Stewart.  This Court stated:

> [I]nsurance policies are matters of contract and the interpretation of insurance contracts is according to the same rules which govern other contracts.  ***In order to have an enforceable insurance contract, the essential elements are an offer and an acceptance, supported by consideration.***

7

*Krebs v. Strange*, 419 So. 2d 178, 181 (Miss. 1982) (emphasis added). "[F]or an insurance contract to exist the minds of the parties must meet as to the terms of the contract." *Scottish Union & National Ins. Co. v. Warren Gee Lumber Co.*, 118 Miss. 740, 754-55, 80 So. 9 (1918).

¶13. The parties dispute whether there was an offer and an acceptance, and if so, which documents constituted the offer and the acceptance. The Plaintiffs assert that the application was an acceptance of Prudential's offer to insure. Prudential contends that the policy was the offer and that there can be no meeting of the minds because the policy was never delivered to Larry or Dr. Stewart.

¶14. The ability to make an offer for insurance lies with the potential insurer as well as the potential insured. *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1177-78 (Miss. 1990). Generally, through bargaining transactions conducted between the insurer's agent and the potential insured, the agent invites the potential insured to make an offer by submitting an application. *Id*. at 1177. In the alternative, the insurer may make the offer through the agent's express assent to the specific and definite terms of coverage. *Id.* at 1178. Such terms include all of the essential terms as delineated in the application – the subject matter of insurance, the period of coverage, the premium, and the amount of insurance. *Id.* There must be a complete understanding between the parties as to these terms in order for such assertions by the insurer or the agent to constitute an offer. *Id.*

¶15. Larry asserts that the insurer made the offer in this case. He states that Dr. Stewart already had been approved for Prudential's "Class H." He claims in his brief that this

8

approval set the underwriting requirements before he submitted the application. However, Larry's trial testimony differs from the assertions in his brief. He testified that a decision had not yet been made regarding underwriting of the policy. Larry answered affirmatively to the question of whether an application is a request that the insurance company consider the applicant for insurance coverage. *Id*. Moreover, the means by which he understood that a contract would be formed in this case was that "[t]he company [had] to make the offer." Accordingly, his expectation was that "[t]he company issues the contract, I accept it, and then we pay the premium." He testified that the offer, which he conceded would come from Prudential, was a document he signed on August 31, 1999. However, as Larry eventually conceded, the document he signed on August 31, 1999, was a "Supplement to the Application" and was clearly titled as such on the first page of the document. He also understood that after the issuance of the policy, there was a process for acceptance, which included delivery, to be completed before the policy would be effective.

¶16.    Prudential and Pruco, on the other hand, argue that the submission of the application was the offer to provide insurance coverage. The terms of the application included a face amount of $1,000,000 and a premium set at $100,000. Pruco contends that it issued a policy which would have constituted a counteroffer since it contained a premium $5,000 higher than that quoted in the application. However, when Bateman called Larry to arrange for delivery of the policy, Larry told Bateman that Dr. Stewart was in a coma. Consequently, Bateman told Larry that he would be unable to deliver the policy and there would be no insurance.

9

¶17.   The treatment of the policy as a counteroffer in this case is consistent with precedent. "To create a contract of insurance there must be an agreement between the insurer and the insured. There must be a meeting of the minds. . . ." *Nunley v. Merrill*, 513 So. 2d 582, 586 (Miss. 1987). Thus, if the terms in the policy issued "differ materially" or are "at variance" from those in the application, tender of such policy constitutes a counteroffer. *Interstate Life & Acc. Ins. Co. v. Flanagan*, 284 So. 2d 33, 36-37 (Miss. 1973). The policy may set the terms of acceptance for the proposed insured. *Id.* at 36. Upon acceptance according to the policy terms and the tendering of consideration, a contract is formed between the proposed insured and the insurance company. *Id.*; *Krebs*, 419 So. 2d at 181.

¶18.   The terms of acceptance of Prudential's counteroffer required Dr. Stewart's signature on the COD endorsement, receipt of the initial premium, and delivery of the policy. Clearly, Dr. Stewart was unable to accept Prudential's counteroffer since he was in a coma. Without an offer and acceptance, no contract was formed, and there is no need to address whether consideration was tendered.

¶19.   The only possible conclusion from the evidence is that an initial offer was made when the proposed insured submitted an application, and the proposed insurer produced in response a policy, which differed in terms, and thus would have constituted a counteroffer. However, as Prudential never presented the policy to the applicant for acceptance, there was no possibility of the occurrence of both an offer and acceptance. For those reasons, the evidence is not of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions with regard to the existence of a

10

contract in this case. The evidence does not sufficiently support the establishment of the requisites of offer, acceptance, and consideration.

¶20. The evidence is insufficient to show a meeting of the minds as to whether an offer was made and what the terms of insurance coverage were. Thus, a contract was never formed between Larry, as representative of the Trust, and Prudential. Therefore, we reverse the jury verdict and render judgment in favor of the Defendants.

## CONCLUSION

¶21. For the foregoing reasons, we find that the trial court erred in denying the Defendants' motion for J.N.O.V. Accordingly, the judgment of the Circuit Court of Hinds County, Mississippi, is reversed and judgment rendered in favor of the Defendants, The Prudential Insurance Company of America and Pruco Life Insurance Company, as the evidence does not demonstrate that a contract for insurance was ever formed between the parties.

¶22. **REVERSED AND RENDERED**.

**SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. RANDOLPH, J., CONCURS IN PART AND IN RESULT. CARLSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., WALLER, P.J., DICKINSON, RANDOLPH AND LAMAR, JJ. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J.**

**CARLSON, JUSTICE, SPECIALLY CONCURRING:**

¶23. While I wholeheartedly join today's majority opinion, I am compelled to write separately to address the dissent's treatment of this Court's recent decision in *Bradfield v. Schwartz*, 936 So. 2d 931 (Miss. 2006).

11

¶24.    In his dissent, Justice Graves finds, *inter alia*, that the $35 million punitive damage award should be affirmed, and states that "[i]n accordance with the process outlined by this Court in **Bradfield**, it appears that the trial court *correctly submitted the [punitive damage] issue to the jury for consideration*." (Emphasis added).   However, notwithstanding this statement, the dissent then launches into a six-page attack of this Court's decision in **Bradfield**.

¶25.    The dissent refers to the Legislature's enactment of the statute requiring bifurcation of trials in which punitive damages are sought as an "overreaching effort [by the Legislature] to protect tortfeasors from punitive damages." If, as opined by the dissent, this was the legislative intent in enacting this statute, the Legislature failed miserably inasmuch as the jury in the case *sub judice* awarded the sum of $35,000,000 in punitive damages after the trial court, according to the dissent, "meticulously followed" the procedure prescribed in **Bradfield**, which required that our trial courts follow the statutory procedure.   As an aside, I note that this "bifurcation statute," which is Miss. Code Ann. § 11-1-65 (Supp. 2007), has been on the books since 1993, though there have been recent amendments to the statute.   The dissent states that this "overreaching effort" by the Legislature evidences the Legislature's "lack of faith and confidence in the ability of jurors to properly resolve disputes," and that this legislative expression of lack of confidence in jurors was "justified" by this Court in **Bradfield**.   The dissent then quotes a portion of **Bradfield** as follows:

> [T]he detailed procedure which is outlined . . . [in the bifurcation statute] must be meticulously followed because without an evidentiary buffer at trial, **juries will ultimately confuse the basic issue of fault or liability and**

12

**compensatory damages with the contingent issue of wanton and reckless conduct which may or may not ultimately justify an award of punitive damages**.

*Id.* at 938. (Emphasis supplied by the author of the dissent). From the language in the dissenting opinion, it is obvious that the dissent wishes to imply that we said in ***Bradfield*** that our citizens who serve on juries in this state are not competent to sort through evidence because they become too easily confused. A careful reading of ***Bradfield*** will cause an objective, well-reasoned person to conclude that the dissent's characterization of ***Bradfield*** is not only unfounded, but untrue.

¶26.   By characterizing ***Bradfield*** in this way, am I to understand that the dissent would likewise find fault with our Miss. R. Evid. 403, which allows a trial judge to exclude otherwise relevant evidence if the probative value of such evidence "is substantially outweighed by the danger of unfair prejudice, ***confusion of the issues***, or misleading the jury?" (Emphasis added). *See **Palmer v. State***, 939 So. 2d 792, 795 (Miss. 2006) (although evidence was admissible under Miss. R. Evid. 404(b), "it still must be admissible under the ultimate filter of Miss. R. Evid. 403"). Does the dissent find fault with the long-standing practice in this state directing trial judges to give cautionary instructions to the jury to inform the jury of the limited nature for which certain evidence was received? Does the dissent find fault with our federal and state constitutional mandates permitting the accused in criminal cases the right to remain silent and our case law finding reversible error when the prosecution impermissibly puts before the jury evidence that the accused exercised his/her constitutional right to remain silent? Does the dissent also find fault with Miss. Code Ann. § 11-1-55 (Rev.

13

2002), which authorizes the trial judge to grant a remittitur or additur if the judge determines that the jury verdict was a result of "bias, prejudice, or passion" on the part of the jury? After all, according to the dissent's approach, jurors are super-humans who are unmoved and unaffected by society's biases and prejudices, and who are able unemotionally to sort through all the evidence, without becoming confused and without any unnecessary interference from judges who might try to limit the evidence the jury receives by such procedures as exclusion, cautionary instructions, or bifurcation of the issues.

¶27.    Also, the dissent asserts that this Court's application of section 11-1-65 in *Bradfield* "is infeasible and is likely to result in a gross inefficient use of judicial resources in those instances where punitive damages are not warranted." I now quote further from the dissenting opinion:

> This Court compounds the inefficiency by requiring that jurors listen to testimony and evidence before a determination as to whether or not the jurors will ever decide the issue relevant to the testimony. This procedure is akin to granting a motion for summary judgment after the trial.

> Although the punitive damages statute requiring bifurcation is unnecessary and this Court's rationale in *Bradfield* is impractical, I find that the trial court in the instant case meticulously followed the *Bradfield* process. After the jury returned a verdict awarding compensatory damages, the evidentiary hearing was promptly commenced. Only two witnesses were called. That makes perfect sense inasmuch as the evidence regarding Prudential's conduct was necessarily presented during the Plaintiffs' and Defendants' cases-in-chief. Both the judge and jury had already heard that testimony prior to the verdict on compensatory damages. Hence, it is much more logical that the judge would decide at that juncture whether or not the jury would be allowed to consider awarding punitive damages.

> However this Court has said that when the jury awards compensatory damages, the trial court should "automatically proceed to the punitive damage

14

phase of the trial." At which time, the trial court must conduct an evidentiary hearing. This Court has indicated that the "evidentiary hearing" involves more than just a judicial evaluation of previously heard testimony.

. . . .

Consequently, the trial court was compelled to proceed with the punitive damage phase upon the return of a verdict for the Plaintiffs awarding compensatory damages.

The "automatic" evidentiary hearing requirement set forth by this Court is infeasible and is likely to result in a grossly inefficient use of judicial resources in those instances where punitive damages are not warranted. If a judge is to serve as a gatekeeper, it is illogical to allow a jury to hear all the evidence and testimony on the issue of punitive damages prior to the judge's determination of whether the jury should consider the issue. The process outlined by this Court in *Bradfield* takes away the judge's discretion to make a preliminary determination, that as a matter of law, punitive damages should not be considered by the jury. Once that discretion is taken away, any prudent judge should be reluctant to deny the jury an opportunity to make a finding regarding a matter about which they have already heard all of the relevant testimony and evidence. That is why the directed verdict is so rarely granted and is disfavored by courts. The *Bradfield* process was followed in the instant case and the result was a jury award of punitive damages.

Dissenting Opinion, ¶¶ 58-61. (Citations omitted).

¶28. Simply put, the dissent's characterization of what this Court said in *Bradfield* is

wrong. Here is a portion of what we said in *Bradfield*:

If the jury awards compensatory damages, then an evidentiary hearing is conducted in the presence of the jury. At the close of this second phase of the trial, via an appropriate motion for a directed verdict, the judge, as gatekeeper, then ultimately decides whether the issue of punitive damages should be submitted to the trier-of-fact (jury). If the judge, from the record, should determine, as a matter of law, that the jury should not be allowed to consider the issue of punitive damages, a directed verdict shall be entered in favor of the defendant on the issue of punitive damages, and the case will end. If, on the other hand, the judge should allow the issue of punitive damages to be considered by the jury, then the jury, upon being properly instructed by the judge on the punitive damages issue, may decide to award punitive damages, and if so, in what amount, or the jury may decide not to award punitive

15

damages. If the jury should award punitive damages, then, prior to entry of the final judgment on an award of punitive damages, the judge, pursuant to Miss. Code Ann. § 11-1-65(1)(f)(I), shall "ascertain that the award is reasonable in its amount and rationally related to the purpose to punish what occurred giving rise to the award and to deter its repetition by the defendant and others," by considering the factors set out in Miss. Code Ann. § 11-1-65(1)(f)(ii)(1-4). While the statute does not envision that the judge could increase the amount of the jury's punitive damages award, the judge could unquestionably, consistent with the statute, reduce the amount of the jury's punitive damages award. Finally, just as in any other case, the judge will ultimately decide, via the appropriate post-trial motions, whether it was error to submit the punitive damages issue to the jury.

*Bradfield*, 936 So. 2d at 939.

¶29. Contrary to the perceived fears expressed by the dissent, the *Bradfield* procedure does not create a "duplication" of the judicial process. After the conclusion of the first phase of the trial where a verdict for compensatory damages has been returned by the jury, there is no language in *Bradfield* which somehow now prohibits the attorneys for some of the parties, or all of the parties, to inform the trial judge that for the second phase of the trial, they wish to incorporate into the record by reference all evidence which was adduced by the parties in the first phase of the trial. I would envision that this would be done in every case prior to commencing the second phase of a bifurcated trial under *Bradfield*. I cannot imagine any trial judge refusing such a reasonable and logical request. This procedure then permits the jury, without hearing or receiving any repetitious testimony or evidence, to have before it all the evidence presented during the first phase of the trial. After the trial judge has granted "the incorporation of evidence" request, the parties may or may not elect to present additional

16

evidence. Regardless of whether additional evidence is presented, the "evidentiary hearing" requirement of section 11-1-65 and **Bradfield** has been met.

¶30. It is obvious that the dissent also perceives that trial judges will be more reluctant to seriously consider a motion for a directed verdict after the jury has been allowed to hear the evidence presented in the punitive damages phase. Frankly, I am appalled at such a suggestion. Trial judges are called upon daily to consider motions for directed verdict after the plaintiff's case-in-chief, after the defendant's case-in-chief, and after the presentation of all the evidence. Likewise our trial judges are called upon daily to consider motions for judgment notwithstanding the verdict after a jury has returned its verdict. Evidently, I have more faith than my dissenting colleagues that our trial judges will "do the right thing" and grant such motions when the evidence, the law, and their oath of office requires that they do so.

¶31. Likewise, the dissent obviously opines that the procedure outlined in **Bradfield** is impractical because the judge may have to grant a directed verdict for the defendant after the parties have gone through the time and effort to present this punitive damage evidence to the jury. As may be inferred from the dissenting opinion, the punitive damages phase of a bifurcated trial may quite often take very little time. Indeed, the punitive damages phase of a trial may be very brief, or it could conceivably last a day, two days, or even longer. What is impractical to me is the dissent's approach to this procedure. What could be more impractical, as suggested by the dissent, than the trial judge, without the jury, having to spend hours or days hearing the punitive damage evidence, only to determine that the jury will have

17

the opportunity to hear this punitive damage evidence? Under this scenario, the judge would have wasted the jurors' time, whether they were in the jury room, or away from the courthouse, as the jurors were awaiting word about their status; and the parties and their witnesses would likewise have to re-present the same evidence before the jury.

¶32.    Finally, I address the statute itself. As noted in *Bradfield*, the statute which applied in that case stated:

> If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing before the same trier of fact to determine whether punitive damages may be considered.

*Id.* at 938 (quoting Miss. Code Ann. § 11-1-65(1)(c)  (Rev. 2002)).[5]

¶33.    I am at a total loss as to how this clear and unambiguous legislative language could be confused or misunderstood. I recognize that the dissent does not like what the statute says. I also recognize that the dissent does not like this Court's interpretation and application of the statute in *Bradfield* inasmuch as the dissent states that our interpretation of the statute in *Bradfield* is "infeasible, illogical, and impractical."  In fact, the dissent somehow mysteriously asserts that the six justices who joined the majority opinion in *Bradfield* "cavalierly" made a substantive change in the law when we required, consistent with the statute, bifurcation of civil trials involving punitive damage issues, in that the result is a

---

[5]Section 11-1-65(1)(c) now states: "If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact."  In my opinion, even if *Bradfield* had been decided under this 2004 amendment to section 11-1-65(1)(c), the outcome would have been the same.

change in the appellate standard of review on punitive damage issues. We have done no such thing.

¶34. Finally, I note that Justice Graves attempts to assure the reader that he is not explicitly stating, or even implying that "the bifurcation statute is unconstitutional." There is good reason for the dissent making this statement. No party raised the issue of the constitutionality of this statute. If any party had wished to attack the constitutionality of this statute in today's case, that party was first required to comply with Miss. R. Civ. P. 24(d) by giving notice to the Attorney General and then raising this issue before the trial court. *Cockrell v. Pearl River Valley Water Dist.*, 865 So. 2d 357, 360 (Miss. 2004).

¶35. I see no effort by any party in this case to give such notice to the Attorney General. I have checked the clerk's docket in this case via the intranet, and I note attorneys for the appellants, attorneys for the appellees, attorneys for friends of the court, and attorneys for other parties, but I do not notice the Attorney General being listed in this case as an attorney-of-record. Therefore the constitutionality of this statute is not before us today. On the other hand, with the "advisory opinion" rendered by the author of today's dissent, and those who have joined him, as to how the dissent feels about the constitutionality of section 11-1-65(1)(c), practitioners have been put on notice that there are at least some on this Court who would look favorably upon such an argument.

¶36. Again, having already fully joined the well-reasoned majority opinion authored by Justice Easley, I could not in good conscience ignore the language in the dissent attacking

this Court's decision in *Bradfield*, especially when, based on the disposition of today's case, such an attack is totally unnecessary.

**SMITH, C.J., WALLER, P.J., DICKINSON, RANDOLPH AND LAMAR, JJ., JOIN THIS OPINION.**

**GRAVES, JUSTICE, DISSENTING:**

¶37.   The majority finds that the evidence in this case was "not of such quality that reasonable and fair minded jurors in the exercise of fair and impartial judgment might reach different conclusions with regard to the existence of a contract in this case."  Moreover, the majority finds that the evidence does not sufficiently support the establishment of the requisite offer and acceptance to support the finding of a contract.  I respectfully disagree.

**I.     Whether the Jury's Findings are Supported by the Evidence.**

¶38.   In addressing Prudential's contentions that the Stewarts failed to present sufficient evidence to support their claims, and that the trial court erred in denying Prudential's Motion for Judgment Notwithstanding the Verdict, it is the responsibility of this Court to consider the standard that the trial judge follows in denying or granting a J.N.O.V.  *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1177 (Miss. 1990).  Deference is accorded to the trial judge's determination to deny the motion because legal issues were decided by the jury.  *Id*.

> Deference will also be accorded the jury's fact-finding because of its position -- unlike this Court's -- to evaluate and weigh the truthfulness of a witness' testimony. The demeanor or bearing of voice, the attitude and appearance of the witnesses, all are primarily for inspection and review by the jury. The jury not only has the right and duty to determine the truth or falsity of the

20

witnesses, but also has the right to evaluate and determine what portions of the testimony of any witness it will accept or reject.

*Id.* (citation omitted).

¶39. It is not the place of this Court to determine what we, as individuals, would have done had we been called as jurors in the instant case. It is the responsibility of this Court to examine the evidence presented by both parties and determine "whether the evidence is of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions." *Poole v. Avara*, 908 So. 2d 716, 726 (Miss. 2005) (citation omitted). Evidence presented could support both the finding that a contract was formed, or the finding that a contract was not formed. In the present case, substantial evidence exists to support the establishment of all the requisites for formation of an insurance contract and therefore, I would find that the jury's findings should be upheld. The jury was allowed to hear all of the relevant testimony and evidence offered by both the plaintiffs and the defendants.[6] Further, the jury had the advantage of assessing the credibility of all witnesses. Having done that, the jury found that a contract had been formed.

1. *Offer*

¶40. As discussed by the majority, this Court has explained two routes by which an offer to enter an insurance contract may be presented. *Andrew Jackson Life Ins. Co.*, 566 So. 2d

---

[6]It is noteworthy that neither the appellants nor the appellee in this case raise any issue about the exclusion of relevant evidence. Hence, it is reasonable to conclude that the jury heard all of the relevant evidence and the arguments of both sides before reaching a verdict.

21

at 1177-78. A potential insurer as well as potential insured may make an offer for insurance. *Id*. In two previous decisions this Court has found that the insurer made an offer which the potential insured accepted by submitting an application. In *Andrew Jackson Life Insurance Company,* an offer by the insurance company was sufficiently shown through the affirmative actions of the agents, who extended an offer of immediate coverage, gave assent on behalf of the insurer to all essential terms and expressed the agreed upon terms in writing. *Andrew Jackson Life Ins. Co.*, 566 So. 2d at 1178-79. Also, in *Safety Drivers Insurance Corporation v. Waggener*, this Court found that the insurer made an offer. *Safety Drivers Ins. Corp.*, 219 Miss. 372, 380-81 (1953). The evidence presented included documents from the insurer signed by the vice-president of the insurance company, soliciting the insured to purchase insurance and declaring all of the essential terms and conditions precedent, which the plaintiff was required to meet in order to consummate the contract. *Id*. at 379-80.

¶41.    The Stewarts assert that Prudential, through its agent, Bateman, made the offer in the instant case. At trial the Stewarts offered evidence in the form of documentation and testimony that on August 19, 1999, Prudential's underwriter offered to insure Dr. Stewart at Select H coverage, which set the underwriting requirements. Larry testified and further offered documentation that Prudential provided the Stewarts with an illustration, dated August 19, 1999. The cover page of the illustration specifically stated:

Pruco Life Variable Universal Life
A Variable Life Insurance Contract
An Illustration Presented to:
Dr. Edsel Stewart

22

by Jim Bateman, CLU [Chartered Life Underwriter[7]],
Registered Representative for use in the state of Mississippi

The purpose of the illustration was to show "how premiums' payments, loans and withdrawals made on [the Contract] may result in or affect cash values and death benefits." The contract description page specifically states: "***Proposed Insured***: Dr. Edsel Stewart[,] Male[,] age 73[,] Select Preferred with Ratings[,] 1,000,000 Variable Universal Life[,] Type A Death Benefit. Initial Annual Premium Outlay $105,000.00." (Emphasis added). The illustration included all of the essential terms to constitute an offer by the insurer's agent, Bateman. The illustration expressly provided that: (1) Dr. Stewart was the proposed insured; (2) the period of coverage was from his current age to his death, (3) the yearly premium was $105,000; (4) and the amount of the policy was for $1,000,000 payable upon the death of Dr. Stewart. Also, it is undisputed that the parties understood the terms contained within the illustration.

¶42. Prudential argues that Larry, as trustee of the Trust, merely submitted an application to Pruco, and in doing so made an offer. Prudential offered evidence that on August 23, 1999, Larry, acting as trustee, applied for a variable life insurance policy with a face amount of $1,000,000 at a premium of $100,000, which Pruco was free to accept, reject, or make a counteroffer. Moreover, Larry's trial testimony revealed that he understood that the application did not create coverage.

---

[7]The term Chartered Life Underwriter (CLU) is an insurance agent designation, and often goes with ChFC credential (Chartered Financial Consultant).

23

2. *Acceptance*

¶43.    Determining whether the evidence is sufficient to demonstrate an acceptance begins with the identification of what constitutes an acceptance. "To create a contract of insurance there must be an agreement between the insurer and the insured. There must be a meeting of the minds . . . [also known as acceptance]." *Nunley v. Merrill*, 513 So. 2d 582, 586 (Miss. 1987). Acceptance may be implied from the actions of the insured. *Old Equity Life Ins. Co., v. Jones*, 217 So. 2d 648, 650 (Miss. 1969). In *Andrew Jackson Life Insurance Company*, this Court upheld the jury's verdict against the insurer where an insurance agent offered to insure the insured. *Andrew Jackson Life Ins. Co.,* 566 So. 2d at 1180. In that case the court found that "acceptance of the offer was manifested through the . . . [insured's]: (1) remittance of seven premiums deducted from his paycheck, and (2) completion of the application which contained the essential terms." *Id*. at 1179.

¶44.    The Stewarts contend that the offer to insure Dr. Stewart was accepted by the signing of the Supplement to the Application on August 31, 1999, by both the Prudential agent, Bateman, and Dr. Stewart. Furthermore, the record reflects that Larry signed another document on August 31, 1999, certifying that "this contract meets my insurance needs and financial objectives." Lastly, in addition to signing the additional papers on August 31, 1999, Dr. Stewart paid a sum of $20,000 to Bateman in the form of a check. The Stewarts assert the check for $20,000 was the first premium payment, which exceeded the initial minimum premium requirement in the amount of $10,308.15.

24

¶45. The record also reflects that on September 9, 1999, Batemen sent a fax to Larry indicating that he would deliver the policy the following week. In further support of their contention, the Stewarts produced a letter written by Prudential, dated on September 17, 1999, thanking Dr. Stewart "for purchasing this life insurance policy from Pruco Life." In a letter dated September 20, 1999, Prudential wrote to Dr. Stewart stating, "Thank you for your application for life insurance with Prudential. We are pleased to issue you a contract."

¶46. Prudential argues that the submission of the application was the offer to provide insurance coverage. Prudential offered evidence that on September 17, 1999, without knowledge of Dr. Stewart's comatose state, they issued a policy which constituted a counteroffer because it (1) had a premium that was $5,000 per year higher than the policy requested in the application, (2) was endorsed to require delivery, and (3) required that Dr. Stewart have continued good health. In both applications, signed on August 23, 1999, and on August 31, 1999, the Stewarts listed a premium of $100,000. The policy issued differed from the Stewarts' application in that the policy required a premium of $105,000, $5,000 higher than the application. However, the Illustration listed the premium as $105,000.

¶47. Prudential contends that upon learning of Dr. Stewart's comatose state, they decided not to make the counteroffer of coverage because Dr. Stewart was unable to confirm that his health remained as reported in the application and that Dr. Stewart failed to satisfy the condition precedents outlined in the application.[8] In particular, Dr. Stewart's health had not

---

[8]In the Terms and Conditions section of the application, under which Larry and Dr. Stewart signed in agreement, Prudential stated the following: "When the Company gives a

25

remained the same as stated in the application; he had been in a coma for more than two weeks by the time that the policy was issued by Pruco on September 17, 1999.

¶48.    The policy was endorsed to provide that coverage did not start until "the contract was delivered," and to require the proposed insured to sign a good health statement at delivery. Prudential asserts that the policy was never accepted as issued because it was never offered or communicated to the policyowner, the Trust, by Bateman or Pruco. The Stewarts contend that sending the policy to Bateman was tantamount to delivery to the Trust.

¶49.    Adhering to this Court's rationale in *Andrew Jackson Life Insurance Company,* the Stewarts presented sufficient evidence to the jury to support its findings of acceptance of the insurance contract on August 31, 1999. The Stewarts introduced testimony to show that Dr. Stewart's health condition did not change until September 1, 1999. Additionally, this Court in *Thurman v. Farmers' Mutual Fire Insurance Company*, an action on an insurance premium note, held that the question of whether the defendant with full knowledge made the application and got the kind of policy for which he applied, was for the jury. *Thurman v. Farmers' Mut. Fire Ins. Co.*, 102 Miss. 77, 81 (1912). Accordingly, the issue of whether the policy was a counteroffer which was withdrawn or a contract was an issue that was *properly submitted to and resolved by the jury*. Because the issue was properly considered

Limited Insurance Agreement form dated on the same date shown below, coverage will start as written in that Agreement. Otherwise, coverage will start on the contract date, provided: (1) The company issues a contract and I accept it; and (2) the first premium is paid in full while all proposed insureds' health remains as stated in the application."

26

by the jury, this Court must give deference to the jury's findings of fact. *Andrew Jackson Life Ins. Co.*, 566 So. 2d at 1177.

3. *Consideration*

¶50. Finding that there was no offer and acceptance, and therefore no contract was formed, the majority finds no need to address whether consideration was tendered. However, because I find that there was sufficient evidence of both offer and acceptance, I will examine the issue of consideration. "All that is needed to constitute valid consideration to support a contract is a benefit to the promisor or a detriment to the promisee." *Frierson v. Delta Outdoor, Inc.,* 794 So. 2d 220, 224 (Miss. 2001) (citations omitted). In *Andrew Jackson Life Insurance Company*, this Court held that the insurer received sufficient consideration in the form of the seven premiums. *Andrew Jackson Life Ins. Co.,* 566 So. 2d at 1178.

¶51. The Stewarts assert that Dr. Stewart paid the first premium in the amount of $20,000 for the life insurance contract. Prudential contends that the payment of $20,000 was not a premium for insurance, but rather a fee paid to Bateman for his estate planning services. The record reflects that Dr. Stewart and Batemen met on August 31, 1999, to sign a Supplemental Application for insurance, and it was at that time that Dr. Stewart gave Batemen the $20,000 check. At the request of Dr. Stewart, Bateman wrote out the check for him to sign, writing on the "For" line the word "fee," and making the check out to JMB Financial Group, Bateman's company. While Prudential contends that the $20,000 was a fee for Bateman's services to Dr. Stewart, there is no evidence on the record that Dr. Stewart had ever paid any other fee or any other amount of money to Bateman at anytime for his estate planning

27

services or for any other reason. Moreover, there exists no documentary evidence with regard to the purpose of this payment.

¶52. Further, Prudential offered evidence of the terms of the application, which indicated that no premium could be submitted with the application because of Dr. Stewart's medical history, and therefore argues that the $20,000 check did not constitute consideration. It alleges that Bateman did not have the authority to accept premiums on the company's behalf before delivery of the policy and satisfaction of delivery requirements.

¶53. Again, considering the conflicting evidence, it is without question that a reasonable and fair-minded juror could have found that sufficient consideration existed to form a contract. More importantly, the jury heard all of the evidence from both parties and decided that a contract existed. Moreover, Prudential makes no argument that substantial evidence in support of its defense was not heard by the jury. Clearly, sufficient evidence was presented to support the jury's finding that a life insurance contract existed and that the award of compensatory damages was appropriate.

## II. Whether the Trial Court Erred in Submitting the Issue of Punitive Damages to the Jury.

¶54. In an overreaching effort to protect tortfeasors from punitive damages, the Legislature passed Mississippi Code Annotated Section 11-1-65, bifurcating trials when punitive damages are sought. In pertinent part, the statute reads:

(c) If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing to determine whether punitive damages may be considered by the same trier of fact.

28

(d) The court shall determine whether the issue of punitive damages may be submitted to the trier of fact; and, if so, the trier of fact shall determine whether to award punitive damages and in what amount.

Miss. Code Ann. § 11-1-65 (Supp. 2007).

¶55.	This Court has further interpreted the statute in ***Bradfield v. Schwartz***, stating:

> If the jury awards compensatory damages, then an evidentiary hearing is conducted in the presence of the jury. At the close of this second phase of the trial, via an appropriate motion for a directed verdict, the judge, as gatekeeper, then ultimately decides whether the issue of punitive damages should be submitted to the trier-of-fact (jury). If the judge, from the record, should determine, as a matter of law, that the jury should not be allowed to consider the issue of punitive damages, ***a directed verdict shall be entered*** in favor of the defendant on the issue of punitive damages, and the case will end. If, on the other hand, the judge should allow the issue of punitive damages to be considered by the jury, then the jury, upon being properly instructed by the judge on the punitive damages issue, may decide to award punitive damages, and if so, in what amount, or the jury may decide not to award punitive damages.

***Bradfield v. Schwartz***, 936 So. 2d 931, 939 (Miss. 2006) (emphasis added).

¶56.	Prior to ***Bradfield,*** the initial determination by the trial court regarding punitive damages would have been made immediately following the verdict on compensatory damages. ***Bradfield,*** 936 So. 2d at 940.  The trial court's decision of whether to allow the jury to consider the issue of punitive damages would be reviewed by the appellate court under an abuse of discretion standard.  ***Doe ex rel. Doe v. Salvation Army***, 835 So. 2d 76, 81 (Miss. 2003) (citing ***Hurst v. Southwest Miss. Legal Servs. Corp.***, 708 So. 2d 1347, 1351 (Miss. 1998)).  However, this Court in ***Bradfield*** said that "when the jury returned a verdict which resulted in a compensatory damages award, a punitive damages phase of trial should have automatically proceeded." ***Bradfield***, 936 So. 2d at 940. In accordance with the process

29

outlined by this Court in *Bradfield*, it appears that the trial court correctly submitted the issue to the jury for consideration. *Id*.

¶57.    After "automatically" proceeding to the punitive damages phase of the trial, the trial judge may determine as matter of law whether the issue of punitive damages should be submitted to the jury.  Pursuant to *Bradfield*, the trial court's decision is reviewed under the standard for a directed verdict, as further discussed herein.  *Bradfield*, 936 So. 2d at 939. This Court reviews whether a directed verdict should have been granted de novo. *Windmon v. Marshall*, 926 So. 2d 867, 872 (Miss. 2006).  "All evidence is considered 'in the light most favorable to the non-movant, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence.'" *Forbes v. GMC*, 935 So. 2d 869, 872 (Miss. 2006).  Furthermore, "[a] trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree."  *Vines v. Windham*, 606 So. 2d 128, 131 (Miss. 1992).  Hence, *Bradfield* takes us from the abuse of discretion standard of review to the totally different de novo review of a decision regarding a directed verdict.  That change is undeniably substantive, and the *Bradfield* majority cavalierly declares that in order to follow the procedure set out in the statute, this substantive change must occur.

¶58.    Mandatory bifurcation is an unwise and inefficient use of judicial resources and of jurors' time. *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 659 (Md. Ct. App. 1992) (holding that mandatory bifurcation would result in the "same witness having to repeat their testimony, . . . this duplication would burden both witnesses and jurors as well as waste

30

judicial resources").[9]  Moreover, the Legislature's enactment of the bifurcation statute is evidence of the Legislature's lack of faith and confidence in the ability of jurors to properly resolve disputes. That lack of confidence is unfounded.  Despite the lack of empirical evidence of jurors' inability to resolve multiple issues, in *Bradfield* this Court justified that lack of confidence by stating:

> . . . [T]he detailed procedure which is outlined . . . [in the bifurcation statute] must be meticulously followed because without an evidentiary buffer at trial, **juries will ultimately confuse the basic issue of fault or liability and compensatory damages with the contingent issue of wanton and reckless conduct which may or may not ultimately justify an award of punitive damages.**

*Bradfield*, 936 So. 2d at 938 (emphasis added).  Again, there is simply no empirical evidence to support such a finding. *Weimer v. International Flavors & Fragrances, Inc.*, 2007 WL 1959103 (N.D. Iowa 2007) (citing *Francis v. Franklin*, 471 U.S. 307, 326, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) ("To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instruction of the court in arriving at their verdict"); *see also*, Jennifer M. Granholm & William J. Richards, *Bifurcated Justice: How Trial-Splitting Devices Defeat the Jury's Role*, 26 U. Tol. L. Rev. 505, 537 (1995) (arguing that "mistrust of juries rests upon generalization and exaggeration, and that empirical evidence provides a solid basis for trusting the objectivity and rationality

---

[9]*See also*, Stephan Landman et al., *Proposed Reforms And Their Effects: Be Careful What You Wish For: The Paradoxical Effects of Bifurcating Claims For Punitive Damages*, 1998 Wis. L. Rev. 297, 335 (1998) (finding that the "incidence of punitive liability increases . . . [and] the size of the award also increases substantially if the case is bifurcated").

of juries").[10]  It is as a result of the bifurcation statute that Mississippi state courts are required to try certain cases in two phases, notwithstanding that practically all of the evidence necessary to phase two will have been presented in phase one.  This Court compounds the inefficiency by requiring that jurors listen to testimony and evidence before a determination as to whether or not the jurors will ever decide the issue relevant to the testimony.  This process is akin to granting a motion for summary judgment after the trial.

¶59.    Although the punitive damages statute requiring bifurcation is unnecessary and this Court's rationale in *Bradfield* is impractical, I find that the trial court in the instant case meticulously followed the *Bradfield* process.  After the jury returned a verdict awarding compensatory damages, the evidentiary hearing was promptly commenced. Only two witnesses were called. That makes perfect sense inasmuch as the evidence regarding Prudential's conduct was necessarily presented during the Plaintiffs' and Defendants' cases in-chief.  Both the judge and the jury had already heard that testimony prior to the verdict on compensatory damages.  Hence, it is much more logical that the judge would decide at that juncture whether or not the jury would be allowed to consider awarding punitive damages.

---

[10](Citing Patrick E. Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tex. L. Rev. 47, 53 (1977) ("Apart from the occasional situation in which a judge possesses unique training. . . the assumption that a jury collectively has less ability to comprehend complex material than does a single judge is an unjustified conclusion."); Jose S. Cecil, et al., *Citizen Comprehension of Difficult Issues: Lessons From Civil Jury Trials,* 40 Am. U. L. Rev. 727, 745 (1991) (studies confirm the general competence of the jury)).

¶60. However, this Court has said when the jury awards compensatory damages, the trial court should "automatically proceed . . . to the punitive damages phase of the trial." *Bradfield*, 936 So. 2d at 939. At which time, the trial court must conduct an evidentiary hearing. *Id*. This Court has indicated that the "evidentiary hearing" involves more than just a judicial evaluation of previously heard testimony. *See Bradfield*, 936 So. 2d at 939 (holding that an evidentiary hearing would allow "both the judge and the jury to evaluate the conduct of Schwartz & Associates in light of the standards of ethics and professionalism that control a firm, and the lawyers within the firm, in the practice of law in this State") (citations omitted). Consequently, the trial court was compelled to proceed with the punitive damage phase upon the return of a verdict for the Plaintiffs awarding compensatory damages.

¶61. The "automatic" evidentiary hearing requirement set forth by this Court is infeasible and is likely to result in a grossly inefficient use of judicial resources in those instances where punitive damages are not warranted. If a judge is to serve as a gatekeeper, it is illogical to allow a jury to hear all the evidence and testimony on the issue of punitive damages prior to the judge's determination of whether the jury should consider the issue. The process outlined by this Court in *Bradfield* takes away the judge's discretion to make a preliminary determination that, as a matter of law, punitive damages should not be considered by the jury. Once that discretion is taken away, any prudent judge should be reluctant to deny the jury an opportunity to make a finding regarding a matter about which they have already heard all of the relevant testimony and evidence. That is why the directed verdict is so rarely granted and is disfavored by courts. ***Dangler v. Doherty,*** 777 F. Supp.

33

1175, 1178 (1991) (stating directed verdicts are disfavored); *see also* ***Robinson v. Gailno***, 275 Conn. 290, 297 (Conn. 2005); ***In re Oakey Custom Homes,*** 168 B.R. 232, 238 (Bankr. D. Colo. 1994). The ***Bradfield*** process was followed in the instant case and the result was a jury award of punitive damages.

¶62.  Explicitly, I do not find nor do I imply that the bifurcation statute is unconstitutional. I simply point out that by determining that the judge should review the issue of punitive damages and decide whether or not to grant a directed verdict, the standard of review on appeal has been changed from an abuse of discretion standard to a standard of "whether or not reasonable jurors could disagree." Those are two totally different standards, and it is impossible to reconcile those two standards in appellate review of the singular issue of punitive damages. Moreover, to indicate that the statute compels such a result is to acknowledge that a "procedural" requirement compels a "substantive" change. Hence, this Court's interpretation of the statute in ***Bradfield*** is infeasible, illogical, and impractical.

¶63.  In the instant case, upon application of the standard set out in ***Bradfield***, I would affirm the trial court's decision to submit the issue of punitive damages to the jury. Moreover, in light of the fact that the net worth of Defendant Prudential exceeded seven billion dollars, the award of thirty-five million dollars in punitive damages was not excessive. In fact, Prudential's net worth was $7,469,076,983.  The thirty-five million dollar award in punitive damages was approximately .5% less than 1% of Prudential's net-worth**.**  This calculation does not include Defendant Pruco's net worth which was $514,870,597.

34

¶64. In sum, substantial evidence exists to support the establishment of all the requisites for formation of an insurance contract – offer, acceptance, and consideration. Moreover, the issue of punitive damages was properly submitted to and decided by the jury. Therefore, I would affirm the trial court's judgment granting compensatory damages in the amount of $1,400,000; punitive damages in the amount of $35,000,000; and attorney fees and costs in the amount $501,638,02. For the foregoing reasons, I respectfully dissent.

**DIAZ, P.J., JOINS THIS OPINION.**