# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-01697-SCT

*WILLIAM A. CAUSEY, M.D.*

*v.*

*REITHA SANDERS, INDIVIDUALLY AND ON
BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES OF ERSEL ALLEN*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/15/2006 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOSEPH L. McNAMARA |
| | STEPHANIE CASE EDGAR |
| | JOHN MICHAEL COLEMAN |
| ATTORNEYS FOR APPELLEE: | RICHARD ARTHUR FREESE |
| | DENNIS C. SWEET |
| | DANIEL F. MARS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 10/23/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.

## RANDOLPH, JUSTICE, FOR THE COURT:

¶1.    Ersel Allen ("Allen"), a 66-year-old female, was admitted to the University of Mississippi Medical Center ("UMC") on April 27, 2001. Doctors at UMC diagnosed Allen with an inoperable tumor at the head of her pancreas and severe chronic obstructive pulmonary disease.

¶2.    After forty-six days at UMC, Allen's family was advised her illness was terminal and that surgery was not an advisable option. Her prognosis from UMC read that Allen "has declined significantly during her hospital stay and her dependence on the staff has escalated precipitously. She has had the optimum therapy for her illness and is now requiring palliative care." UMC recommended that Allen be transferred to a hospice facility. It was determined that Allen would be best suited for a hospice facility rather than in-home hospice care. Allen was admitted to Hospice Ministries, Inc. ("Hospice") in Madison, Mississippi, on June 12, 2001.

¶3.    To be admitted to Hospice, a patient must have a terminal prognosis with expected survival of less than six months. A statement, executed by Dr. William Causey, ("Dr. Causey"), then the Medical Director of Hospice Ministries, and a UMC physician certified that Allen was "terminally ill with a life expectancy of six (6) months or less, if the disease follows its normal course." The admission agreement, signed by Allen's daughter, stated the primary goal of Hospice was to provide pain management and palliative care. An intake form included a diagnosis of pancreatic cancer.

¶4.    Based on UMC's diagnosis and records, Dr. Causey treated Allen as a pancreatic cancer patient, although biopsies performed on May 7 and May 15 at UMC were negative for cancer. Dr. Causey, with the assistance of Hospice nurses and its pharmacist, determined the dosage levels of pain medication to be administered to Allen. Morphine was administered by UMC for pain control, and it was continued by Hospice until July 6, 2001, when Dr.

2

Causey prescribed Dilaudid.[1] The interdisciplinary team led by Dr. Causey at Hospice altered Allen's medication from morphine to hydromorphone,[2] seeking to reduce nausea. Causey testified that the dosages of hydromorphone were increased incrementally due to Allen's continued complaints of pain. The principal factor in changing dosages of pain reliever was the degree of pain relief balanced against excessive sedation or suppression of respiratory activity. However, Dr. Causey further testified,

> As [Allen] got weaker and weaker, she was awake less. And during that time, she was not given any extra doses of or boluses of the Dilaudid. As she got weaker and became less responsive, we observed her more closely and tried to limit the amount of Dilaudid she was getting so that Dilaudid itself wouldn't be the reason for her being more unresponsive or more poorly responsive.

¶5. On July 20, 2001, Allen died. An autopsy was performed. The pathologist who performed the autopsy testified that although the autopsy revealed that Allen had hypertensive heart disease, coronary artery disease, and emphysema, there was no evidence that Allen had pancreatic cancer and she had been misdiagnosed. The pathologist further testified that to "a reasonable degree of professional certainty there was an overwhelming lethal dose of Dilaudid . . . based on the toxicology report" and that Allen had died of a massive dose of hydromorphone. The pathologist testified that 6,900 nanograms, the amount found in Allen's system, was a toxic amount and that he had never seen that amount in a human being. Along with other witnesses, a retained expert for the Defendant, Dr. Melvin Gitlin, testified that the autopsy did not reveal gallstones, pancreatic cancer, a tumor at the

---

[1]Dilaudid is an opioid for pain. Various witnesses testified its potency was four to seven times that of morphine.

[2]"Hydromorphone" was used interchangeably with "Dilaudid" throughout trial and is the generic term for the drug.

3

head of the pancreas, or blockages in the bowel, all conditions or illnesses for which Allen was treated at UMC.

¶6.     Dr. Causey and witnesses he presented posited that regardless of whether Allen had pancreatic cancer, she still had a life expectancy of less than six months.  Dr. David Duddleston, an expert for Dr. Causey, testified to same. Furthermore, it was his position that there is no maximum limit on the dosage of Dilaudid for a patient in her condition and finally, that Allen did not die from a Dilaudid overdose, but rather as the result of various disease processes.

## PROCEDURAL HISTORY

¶7.     Allen's daughter, Reitha Sanders ("Sanders"), filed suit. An amended complaint was later filed. The defendants were: (1) UMC; (2) Mark Williams, MD; (3) Phil McCluskey, MD; (4) William Causey, MD; (4) D. Daniel, RN; (5) Hospice Ministries, Inc.; (6) Hospice of Central Mississippi, Inc.; and (7) John Does 1-10. The amended complaint stated that but for the misdiagnoses made at UMC, Allen would not have been sent to Hospice Ministries, where she was given an overdose of Dilaudid. The amended complaint averred both UMC and Hospice were negligent in their treatment of Allen, and further, that UMC and Hospice acted in gross disregard for the rights and safety of Allen. Sanders requested judgment against all defendants, jointly and/or severally and sought compensatory, incidental, consequential and punitive damages. A separate answer was filed on behalf of UMC, which claimed immunity under the Mississippi Tort Claims Act. Dr. Causey filed an answer stating he was not negligent and that he had treated Allen with "such reasonable diligence, skill, competence and prudence as practiced by minimally competent physicians in the same

4

specialty or general field of practice throughout the United States." A separate answer was filed on behalf of Daniel and Hospice, stating they had used reasonable and ordinary care as would other minimally competent health care providers in good standing.

¶8.     UMC physicians, Drs. Williams and McCluskey, along with Hospice nurse Daniel, were voluntarily dismissed from this action. UMC reached settlement with Sanders for $15,000, and it was dismissed from the action. Trial took place against the remaining defendants, Dr. Causey and Hospice.[3]

¶9.     Subsequent to Plaintiffs resting their case-in-chief, Dr. Causey moved for a directed verdict, citing insufficient expert testimony, and his motion was denied. Prior to the verdict, Hospice settled for $1,000,000. A unanimous jury verdict was returned against Dr. Causey in the amount of $4,000,000.

¶10.    Subsequent to the compensatory damages award, the trial judge automatically submitted the punitive damages issue to the jury. Sanders offered no additional proof of wrongdoing to support punitive damages other than that submitted in her case-in-chief. Dr. Causey objected to the jury considering insurance as evidence of net worth. Preserving his objection, Dr. Causey stipulated to the amount. The jury awarded Sanders an additional $500,000 in punitive damages, by a vote of nine-three.

¶11.    By agreement, Dr. Causey received credit for the settlement amounts of UMC and Hospice. Judgment was thus entered against Dr. Causey in the amount of $3,485,000.

---

[3]Dr. Causey was not present at trial, as he was at the time of trial and currently is, incarcerated at a federal corrections facility. Dr. Causey was convicted in a Louisiana federal court and is serving a twenty-five-year sentence. Dr. Causey testified by deposition. His absence from the proceedings is not at issue in this appeal.

5

¶12. Subsequent to the entry of judgment, Dr. Causey filed a Motion for Judgment Notwithstanding the Verdict, a Motion for Remittitur and/or to Strike Punitive Damages, and a Motion for New Trial. Each of these post-trial motions was denied.

¶13. Dr. Causey timely presented his appeal and submitted the following issues:

I. Whether the trial court erred in allowing Sanders's experts to testify as to the standard of care applicable to Dr. Causey and to Hospice Ministries.[4]

II. Whether the trial court improperly limited the testimony of the defense experts.

III. Whether the trial court committed reversible error in failing to allocate fault to UMC, a settling defendant.

IV. Whether the trial court erred in automatically submitting punitive damages to the jury.

V. Whether the trial court erred in denying Dr. Causey's motion for remittitur.

VI. Whether the trial court erred in not instructing the jury as to "chance of recovery."

**ANALYSIS**

**I.  Whether the trial court erred in allowing Sanders's experts to testify as to the standard of care applicable to Dr. Causey.**

¶14. "The standard of review for the admission or exclusion of testimony is abuse of discretion. The admission of expert testimony is left to the sound discretion of the trial judge. Unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand." *City of Jackson v. Estate of Stewart*, 908 So. 2d 703, 708 (Miss. 2005) (citing *Crane Co. v. Kitzinger*, 860 So. 2d 1196, 1201 (Miss. 2003)).

---

[4]We consider this issue only as to Dr. Causey, as Hospice is not a party to this appeal.

¶15. During trial, Sanders provided the following experts, whom the trial court qualified as experts in their respective fields:

(a) Dr. Steven Hayne: forensic pathology. Dr. Hayne testified there was no evidence that Allen had pancreatic cancer and that she had been misdiagnosed. He further testified that to "a reasonable degree of professional certainty there was an overwhelming lethal dose of Dilaudid . . . and that Allen had died of a massive dose of hydromorphone. He testified that 6,900 nanograms, the amount found in Allen's system, was a toxic amount.

(b) Carman McIntire: forensic toxicology. McIntire was requested by Dr. Hayne to perform a forensic toxicological analysis on biological specimens. This was done in the course and scope of her normal job at the Mississippi Crime Laboratory. McIntire was responsible for sending these samples to National Medical Services ("NMS"), a reference laboratory utilized by the State. The NMS lab detected hydromorphone in the biological specimen at a concentration of 6,900 nanograms per milliliter. McIntire testified that she had never seen lab results showing that high an amount of hydromorphone in the fifteen years she had been forensic toxicologist at the crime lab.

(c) Dr. James Garriot, Ph.D: pharmacology and toxicology. Dr. Garriott is an adjunct professor at the University of Texas Health Science Center. Prior to becoming a professor, Dr. Garriott was Chief Toxicologist for the Bexar County Medical Examiner's Office in San Antonio, Texas. He has approximately thirty-five years employment as a professional toxicologist and has written on the topic of Dilaudid, beginning with a forensic toxicology research study on Dilaudid in 1978. Dr. Garriott has a history of professorships and teaching in pathology and pharmacology and is board certified as a forensic toxicologist. At trial, Dr.

7

Causey did not object to Dr. Garriott's qualification as an expert. Dr. Garriott testified that Allen was administered a lethal dose of Dilaudid and that she died as a result.

(d) Dr. Perry Hookman: gastroenterology and internal medicine. Dr. Hookman was proffered as an expert on the standard of care applicable to an internist. Dr. Hookman holds a masters degree in Health Administration and is board certified in medical management. He is on faculty at Johns Hopkins University and has authored or co-authored approximately fifty publications. Dr. Hookman has been in private practice for more than twenty-five years and is a teacher to other physicians, interns and residents in internal medicine and gastroenterology. Dr. Hookman testified that he saw no evidence of pancreatic cancer in Allen and that the doses of Dilaudid given to her were "off the scale." Dr. Hookman testified that it was likely Allen could have survived another six or seven years but for the Dilaudid overdose.

¶16.    Each of these experts testified that Dr. Causey had breached the applicable standard of care and that Allen was given lethal doses of Dilaudid.

¶17.    Dr. Causey submits that while these experts are qualified and well-versed in their respective fields, they were not qualified to testify in the field of hospice and palliative medicine. Dr. Causey claims that none of these experts had any specialized training or board certification in the fields of palliative medicine, pain medicine, hospice medicine, or pain management. However, neither did Dr. Causey. Dr. Causey asserts that "hospice care and palliative medicine is a recognized specialty." At trial, Dr. Causey objected to each of Sanders's experts, stating that none of their experts was familiar with the standard of care applicable to a hospice patient and were testifying outside their area of expertise. "[W]hile

8

[Plaintiffs] continue to say there's no hospice standard of care, there is a standard of care applicable to the nurses and doctors practicing in that specialty. And these experts have said they're not familiar with that. They're only approximately familiar with it." Each of these objections were overruled by the trial court. The following exchange took place between defense counsel and the trial judge:

> **Court:** Let me ask you this, what is the difference between what you should have done at a hospice and what you should have done at the hospital, or what a doctor should have done in his office?
> **Defense Counsel:** In a hospital, Your Honor, the treatment is curative. They're trying to save the patient. . . . In a hospice they are not doing that. All they are doing is keeping them comfortable until they die. . . .
> **Court:** [T]he jury will be entitled to listen to all of the experts, to decide whether they will accept or reject. . . .

¶18. Dr. Causey offered the following experts, all of whom agreed with Sanders's experts that it would have been a violation of the standard of care to hasten Allen's death or to kill Allen with an overdose of Dilaudid:

(a) Ronnie Bagwell, Pharm.D: qualified as an expert in pharmacology. Dr. Bagwell serves ten hospices with pharmaceuticals, including the hospice where Allen died. Dr. Bagwell was a member of the interdisciplinary team which made decisions for patients, including Allen. Dr. Bagwell testified that based on his experience, the dosages given to Allen were normal given the pain she was experiencing. However, while testifying, Dr. Bagwell was asked if he relied on or even recognized palliative care texts and he testified that he did not.

(b) Dr. James Norris: qualified as an expert in toxicology. However, Dr. Norris testified he had never written in the area of pain management, nor had he studied Dilaudid

9

or other ophioids. Dr. Norris recognized an article co-authored by Sanders's expert, Dr. Garriott, as authoritative in the area of toxicity caused by Dilaudid.

(c) Dr. Gerry Ann Houston: board-certified in hospice and palliative care, and qualified as an expert in oncology. Dr. Houston is also the in-home medical director for Hospice and also helped to start Hospice. Dr. Houston, a friend and former colleague of Dr. Causey, testified that, while it was discovered Allen did not have pancreatic cancer, Allen most likely suffered from a pancreatic carcinoma, and "to a reasonable degree of medical probability, it was her opinion that hospice care was appropriate." However, Dr. Houston testified that she did not determine whether Allen had received a lethal dose of Dilaudid. Dr. Houston testified that according to *Topics in Palliative Care,* that "there is no maximum safe dose of morphine and other pure mu antagonist opioids." Dr. Houston further testified that she "was not aware of a toxic administration or dose for Dilaudid." She testified that if a patient exhibits pain, the dosage should be increased, whereas sleepiness and respiratory depression would dictate a decrease in dosage. Dr. Houston conceded that it would be a direct violation of the Hospice guidelines to hasten any patient's death and that if titration of medication by a hospice led to a person's death, that action would be a breach in the standard of care for a hospice setting.

(d) Dr. Melvin Gitlin: tendered as an expert in the field of pain management of terminal patients, but qualified as an expert in anesthesiology by the trial court. Dr. Gitlin testified he was not familiar with clinical studies showing the average amounts of opioids found in a person's system when they overdose, although he had taught on the use of opioids in the treatment of chronic pain. Dr. Gitlin testified that he could not calculate a microgram

per nanogram when determining dosage amounts. Dr. Gitlin additionally testified that "no ceiling" means that there is not a level at which giving a person more would have no more of an effect, but that there is definitely an amount that will kill a person and there is an amount that is too much.

(e) Dr. James Lauridson: qualified as an expert in forensic toxicology. Dr. Lauridson is the Chief Medical Examiner for the Alabama Department of Forensic Sciences. Dr. Lauridson testified he disagreed with the cause of death as stated in the autopsy report. It was his opinion that Allen's death was due to severe lung disease, coupled with pneumonia and pre-existing heart disease. Dr. Lauridson additionally testified that he had never seen a patient with that much Dilaudid in his or her system and that no one with 6,900 nanograms of Dilaudid in their system should be alive.

(f) Dr. Michael Byers: qualified as an expert in internal medicine. Dr. Beyers, who was formerly in private practice with Dr. Causey, testified he was an infectious-disease specialist and worked part-time at Hospice in late 2002. He became the co-medical director of inpatient Hospice in 2003, one-and-a-half years after Allen's death. Dr. Byers's curriculum vitae listed no professional memberships related to hospice care. He had not authored peer-reviewed articles on hospice care, or Dilaudid or Dilaudid overdosing; nor had he been involved in any case studies related to Dilaudid overdosing. Dr. Byers was allowed to testify that he had given the same dosages to similarly situated patients, but could not remember the exact cases. Dr. Byers was allowed to testify that it was his opinion that Sanders did not die of an overdose and that this amount of Dilaudid did not strike him as unusual, as the principal factor one looks at in treating a terminal patient is achieving pain

11

control. However, Dr. Byers testified that if a medical provider "titrated someone to death," the provider was not properly titrating someone's medications. He further testified that if Hospice had given Allen a dose of Dilaudid that was enough to kill her, Dr. Causey had fallen below the standard of care. Dr. Byers also testified he had no criticism of the autopsy, and that he did not know the amount of a lethal dose of Dilaudid.

(g) Dr. David Duddleston: qualified as an expert in internal medicine. Dr. Duddleston testified in his capacity as Allen's treating physician at UMC. Dr. Duddleston described Allen as cachectic, which he characterized as "wasted, very, very malnourished; sunken cheeks, sunken head, shriveled extremities, no fat anywhere . . . in pain. She had some abdominal pain . . . and she was jaundiced." Dr. Duddleston certified that Allen was "terminally ill with a life expectancy of six (6) months or less, if the disease follows its normal course." However, Dr. Duddleston testified at trial that regardless of whether Allen had pancreatic cancer, she still had a life expectancy of less than six months.

¶19.    While none of the experts for Sanders was qualified by the Court as an expert in "hospice care" or "palliative medicine," the physicians testified they had experience in pain management and care of chronically ill patients. The experts offered by Causey were allowed to testify that Allen was not given a lethal dose of Dilaudid and that there was no ceiling dose for Dilaudid when given in a pain management setting.

¶20.    During trial, all experts presented by both parties met the standards as outlined by Mississippi Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct., 125 L. Ed. 2d (1993).

¶21.    However, Dr. Causey asserts Sanders's experts should have been limited to testify as to the standard of care in a *hospice* setting, vis-a-vis the standard of care otherwise applicable to physicians. Dr. Causey cites this Court's decisions in ***Cheeks v. Bio-Medical Applications, Inc.,*** 908 So. 2d 117 (Miss. 2005), and ***Troupe v. McAuley,*** 955 So. 2d 848 (Miss. 2007), for the proposition which this Court espoused in ***Poole v. Avara***. "An expert must exercise the same level of intellectual rigor that characterizes the practice of an expert in the *relevant field*." ***Poole v. Avara,*** 908 So. 2d 716, 724 (Miss. 2005) (citing ***Miss. Trans. Comm'n v. McLemore,*** 863 So. 2d 31, 37-38 (Miss. 2003) (emphasis added)).

¶22.    Sanders submits that Dr. Causey seeks to expand this Court's holdings regarding the standard of care for physicians, by creating a "phantom 'hospice' standard of care." Dr. Causey, acting as medical director for Hospice, was an internist with a specialty in infectious diseases. Sanders asserts that the experts she presented were qualified to testify as to Allen's medical condition, the events surrounding her death, and the standard of care to which Dr. Causey should have been held. Hospice is not a party to this appeal, and therefore we are not required to address whether a separate standard of care applies to hospice facilities.

¶23.    It is certain that to present a case of medical malpractice,

> a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care; and (3) establishing that the defendant physician failed to conform to the standard of care. In addition, (4) the plaintiff must prove the physician's noncompliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's damages.

***Cheeks,*** 908 So. 2d at 120 (citations omitted). Furthermore, this Court has held:

13

> The general rule as to expert testimony in medical malpractice actions is that "a specialist in a particular branch within a profession will not be required." C. McCormick, Evidence, § 13 (3d ed. 1984). Most courts allow a doctor to testify if they are satisfied of his familiarity with the standards of a specialty, though he may not practice the specialty himself. One court explained that "it is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility."

*Brown v. Mladineo*, 504 So. 2d 1201, 1202 (Miss. 1987) (citations omitted).

¶24.    This Court "has consistently stated that when considering Miss. R. Evid. 702 issues, our trial judges are placed in the role of gatekeepers, 'ensuring that expert testimony is both relevant and reliable.'" *Troupe,* 955 So. 2d at 857 (citation omitted). We find the trial judge did not abuse her discretion in allowing Sanders's experts to testify as to the condition of Allen and violation of the standard of care by Dr. Causey. It should be noted the trial court also allowed Dr. Causey's experts to opine as to Allen's condition and cause of death, and that in their opinion, Dr. Causey did not violate the standard of care.

¶25.    In *Daniels v. GNB, Inc*., 629 So. 2d 595, 603 (Miss. 1993), we stated that 'judging the expert's testimony and weight to be accorded thereto is the province of the jury.' *Id*. at 603 (citing *Ford Motor Co. v. Cockrell*, 211 So. 2d 833, 837 (Miss. 1968)). In *Chisolm v. Eakes*, 573 So. 2d 764, 757 (Miss. 1990), this Court stated that '[t]he jury may consider the expert testimony for what they feel that it is worth, and may discard it entirely.'

*Fleming v. Floyd*, 969 So. 2d 868, 878 (Miss. 2007).

¶26.    Additionally, "[w]hen there is a conflict of expert medical opinion, this Court has held it to be within the province of the fact-finder to determine the cause of death." *Delta Reg'l Med. Ctr. v. Venton*, 964 So. 2d 500, 506 (Miss. 2007) (citation omitted).

¶27.    "A jury's verdict is given great deference by this Court, and 'conflicts of evidence presented at trial are to be resolved by the jury.'" *Johnson v. St. Dominics-Jackson Mem'l*

14

***Hosp.***, 967 So. 2d 20, 23 (Miss. 2007) (citation omitted). In the case sub judice, the jurors were provided with conflicting expert testimony and rendered their decision accordingly.

## II. Whether the trial court improperly limited the testimony of the defense experts.

¶28. As noted in Sanders's brief, Dr. Causey has offered no authority in support of this argument. "'This Court has held that it is the duty of an appellant to provide authority and support of an assignment.' If a party does not provide this support this Court is under no duty to consider assignments of error when no authority is cited." ***Hoops v. State***, 681 So. 2d 521, 526 (Miss. 1996) (internal citations omitted).

¶29. Notwithstanding the procedural bar, the record is replete with testimony, some of which is summarized in Issue I, supportive of Dr. Causey's theory of the case.

## III. Whether the trial court committed a reversible error in failing to allocate fault to UMC, a settling defendant.

¶30. Failure to allocate fault is a question of law, which shall be reviewed de novo by this Court. *See **Entergy Miss., Inc. v. Hayes***, 874 So. 2d 952, 958 (Miss. 2004).

¶31. In her First Amended Complaint, Sanders named UMC as a defendant, stating, "The UMC, through its agents, doctors, nurses, and/or medical staff, breached the standard of care by diagnosing Ms. Allen with terminal cancer. . . and transferring Ms. Allen to Hospice Ministries to die." Prior to trial, UMC settled with Sanders for an amount which was kept confidential from the jury. *See **Robles v. Gollot and Sons Transfer and Storage, Inc.,*** 683 So. 2d 383, 385 (Miss. 1997).

¶32. During trial and in her brief, Sanders argued that the proximate cause of Allen's death was an overdose of Dilaudid prescribed by Dr. Causey.

¶33. During trial, Dr. Causey, while not conceding the negligence of UMC, continued to put on evidence that he and the staff at Hospice were led to believe by the medical diagnosis and records of UMC that Allen had six months or less to live and were treating her for pain, rather than for curative purposes. Dr. Causey submitted,

> The fact is, the administration of Dilaudid to Mrs. Allen was not an intervening cause of her death, but instead an action taken pursuant to [UMC's] original diagnosis. Thus the administration of Dilaudid was just a link in the 'natural and continuous sequence' that evolved as a result of [UMC's] diagnosis. *See Patterson v. Liberty Assocs., L.P.*, 910 So. 2d 1014, ¶ 14 (Miss. 2004). Without [UMC's] original diagnosis and certification Mrs. Allen would never have been sent to Hospice, and the administration of Dilaudid did not break the sequence of treatment such that it would diminish or sever [UMC's] liability. It was forseeable that [UMC's] diagnosis would lead to pain management treatment and lack of further curative treatment, and that this would be dangerous, but for the fact that the patient was dying.

¶34. In his Motion for Directed Verdict, Dr. Causey argued the following,

> **Counsel:** [T]here is evidence in this case, plenty of evidence that UMC was negligent. We did not put that on. The plaintiffs did and we are entitled to rely on that. If the jury comes back and finds that UMC is negligent, we're entitled to an allocation of fault on those grounds. And if they find a hundred percent of liability to UMC, we're entitled to rely on that. And what I'm saying is as a matter of law before we even go to the jury, UMC is the proximate cause and not us. They put into motion the agency by and through which this death occurred, we would never have even known about Ms. Allen. And that's why I think as a matter of law they're the- - -
> **Court:** You're claiming that the Plaintiffs are claiming that the overdose was caused by UMC's negligence?
> **Counsel:** We would never have known Ms. Allen existed if UMC did not send her to us. So but for the misdiagnosis, we could never have given her 1 milligram of Dilaudid. And we don't contend an overdose occurred. But UMC is the one who certified her as terminal.
> **Court:** If UMC certified her as terminal and your client did indeed treat her for that terminal situation, then she would have died without the overdose of Dilaudid?
> **Counsel:** Right. That's our defense.

16

¶35. Based on the pleadings and transcript before this Court, an issue was made of the alleged negligence of UMC, and that but for UMC's misdiagnosis, Allen would not have entered hospice. Although the jury was presented with evidence regarding the alleged negligence of UMC, the trial court refused to issue an instruction regarding allocation of fault, stating, "[i]t has no effect whatsoever in determining the issues of whether the Hospice overdosed or not." Additionally, the trial court declined to allow the form of the verdict to contain any reference to UMC. The trial court deducted the settlement amount of UMC and Hospice Ministries from the verdict rendered against Dr. Causey. *See Mack Trucks, Inc. v. Tackett*, 841 So. 2d 1107, 1116 (Miss. 2003).

¶36. The trial court ruled that the issue before the jury was whether there was an overdose of Dilaudid by Hospice, and if so, was it the sole or proximate cause of Allen's death.

¶37. This Court has found that for an "intervening and superceding cause to extinguish liability of the original actor, the cause must be unforeseeable." *Thomas v. The Columbia Group, LLC*, 969 So. 2d 849, 854 (Miss. 2007) (citing *Newell v. S. Jitney Jungle Co.*, 830 So. 2d 621, 623 (Miss. 2002)).

¶38. This Court has further held, "[t]he law dealing with the duty to foresee the imprudent acts of others appears under the general rubric of the jurisprudence of 'intervening cause.'" *Southland Mgmt. Co. v. Brown By & Through Brown*, 730 So. 2d 43, 46 (Miss. 1998). The Second Restatement of Torts defines a superseding cause as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Id.* (citing Restatement (Second) of Torts § 440 (1965)). Under this theory, an original actor's negligence may be

17

superceded by a subsequent actor's negligence, if the subsequent negligence was unforeseeable. *See Southland Mgmt. Co.*, 730 So. 2d at 46. This Court has held that, if "the intervening cause is one which in ordinary human experience is reasonably to be anticipated, or one which the defendant has reason to anticipate under the particular circumstances," the subsequent actor's negligence is foreseeable and does not break the chain of events between the negligence of the first actor and the injury. *Id.* (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 44 (5th ed. 1984)). *See also Pargas of Taylorsville, Inc. v. Craft*, 249 So. 2d 403, 408 (Miss. 1971) (holding that a defendant is chargeable only with anticipating reasonable probabilities; therefore a person is not bound to anticipate the unusual, improbable, or extraordinary occurrence, although such happening is within the range of possibilities) (citation omitted).

¶39.    Although UMC anticipated Allen would die within six months, it cannot be fairly argued that UMC reasonably anticipated Allen's death would be from an overdose. This Court ruled in *Robison v. McDowell,* "negligence which merely furnished the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof." *Robison v. McDowell*, 247 So. 2d 686, 688 (Miss. 1971) (citations omitted). Thus, "[i]f the act complained of is only a remote cause, superseded by an independent, efficient intervening cause that leads in unbroken sequence to the injury, the original negligent act is not a proximate, but a remote, cause. Thus, not being foreseeable, the original cause is not actionable." *Robison*, 247 So. 2d at 689.

18

¶40. "[N]egligence is remote and non-actionable which merely causes a person to be at a particular place at a particular time where such person is injured as a result of the negligent act of another, who puts in motion a different and intervening cause which efficiently leads in unbroken sequence to the injury." **Entrican v. Ming**, 962 So. 2d 28, 36 n.2 (Miss. 2007) (citation omitted). Based on this Court's precedent, UMC could not have reasonably foreseen that when Allen entered the hospice, she would be overdosed with Dilaudid.

¶41. Furthermore, Dr. Causey cannot find refuge in Mississippi Code Annotated 85-5-7 (Supp. 2008). Assuming arguendo that UMC was negligent, proximate cause must be satisfied for fault to be allocated pursuant to Mississippi Code Annotated 85-5-7(1)[5] and it must be proved that UMC and Dr. Causey consciously and deliberately pursued a common plan or design to commit a tortious act before joint and several liability may be imposed. *See* Miss. Code Ann. § 85-5-7(4) (Supp. 2008).[6] There is no evidence that UMC actually took part in Dr. Causey's decision to switch the medication to Dilaudid, or to establish the dosage.

---

[5] Mississippi Code Annotated Section 85-5-7(1) (Supp. 2008) states:
As used in this section, "fault" means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including, but not limited to, negligence, malpractice, strict liability, absolute liability or failure to warn. "Fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent.

[6] Mississippi Code Annotated Section 85-5-7(4) (Supp. 2008) states,

(4) Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert.

19

¶42.     Accordingly, we find the trial court did not err in not issuing an allocation of fault instruction.

**IV.     Whether the trial court erred in automatically submitting punitive damages to the jury.**

¶43.     Before trial commenced, the trial judge did not mention the case name, but made reference to an opinion of this Court,[7] and stated, "It basically said if there's any kind of verdict of a dollar or more, I don't have a choice. I always submit punitive damages to the jury." Subsequent to the verdict being rendered for compensatory damages, the trial court immediately moved into the punitive damages portion, stating,

> [I]f a compensatory decision is found, it would automatically go the jury without consideration by the court. Under the law prior to that, the court would make a ruling after reviewing evidence that has come in this case. This case has been going on for two weeks. I have kept notes in that regard. I find that there is a genuine issue of material fact on the issue of punitive damages. That it should go to the jury. That is not an issue for this court to decide as a matter of law. And as such, the court will submit it to the jury. And whether that meets the automatic cause or not, I don't know. But because that case has not reached its final disposition, the court will decide under the old rulings. With that being said, we will now proceed with the issue of punitive damages evidentiary hearing before the jury and submit the issue.

¶44.     Dr. Causey reads into the trial judge's statement that she "automatically" submitted punitive damages to the jury. The counter argument is that the trial judge was deciding this issue under our previous rulings or statute. Based on the record before us, we cannot be

---

[7]Based on the date of this trial, the trial judge likely was referencing this Court's decision in ***Bradfield v. Schwartz,*** 2006 Miss. LEXIS 268 (Miss. 2006), in which this Court issued a substitute and final opinion after the opinion was first issued in this case. *See **Bradfield v. Schwartz**,* 936 So. 2d 931 (Miss. 2006).

20

certain which is correct. However, whether the judge's ruling was made by statute or by a perceived "automatic" standard is of no consequence, as there is error in both.

¶45.    The use of the word "automatically" in ***Bradfield v. Schwartz***, 936 So. 2d 931 (Miss. 2006) has been misconstrued by some, and today, we take the opportunity to clarify. The word "automatic" refers to the facts in the ***Bradfield*** case itself. The preceding paragraph in ***Bradfield*** clearly lays out the procedure for when and if a jury should consider punitive damages and there is no mention of "automatic" or "automatically."

> If the jury awards compensatory damages, then an evidentiary hearing is conducted in the presence of the jury. At the close of this second phase of the trial, via an appropriate motion for a directed verdict, the judge, as gatekeeper, then ultimately decides whether the issue of punitive damages should be submitted to the trier-of-fact (jury). If the judge, from the record, should determine, as a matter of law, that the jury should not be allowed to consider the issue of punitive damages, a directed verdict shall be entered in favor of the defendant on the issue of punitive damages, and the case will end. If, on the other hand, the judge should allow the issue of punitive damages to be considered by the jury, then the jury, upon being properly instructed by the judge on the punitive damages issue, may decide to award punitive damages, and if so, in what amount, or the jury may decide not to award punitive damages.

***Bradfield v. Schwartz***, 936 So. 2d 931, 939 (Miss. 2006). The decision in ***Bradfield*** does not stand for the proposition that the trial court should automatically submit the issue of punitive damages to the jury for determination, but only that the trial judge should commence an evidentiary hearing before the jury on the issue of punitive damages, and at the conclusion of this evidentiary hearing in the second phase, the trial court has available all of the traditional options for determining whether or not the punitive-damages issue should be submitted to the jury.

21

¶46.    Mississippi Code Annotated Section 11-1-65 (c) and (d) (Supp. 2008) (emphasis added) holds,

> (c) If, but only if, an award of compensatory damages has been made against a party, *the court shall promptly commence an evidentiary hearing* to determine whether punitive damages may be considered by the same trier of fact.
> (d) The court shall determine whether the issue of punitive damages may be submitted to the trier of fact; and, if so, the trier of fact shall determine whether to award punitive damages and in what amount.

¶47.    No additional evidence was presented by either party regarding conduct that would justify punitive damages, and there was no separate evidentiary hearing. The jury was instructed, "[t]he court would then instruct you that you are to consider all of the evidence in this case that has previously been presented to you in the compensatory phase just as if it were re-filed again for this particular phase of the trial."

¶48.    "The jury should be allowed to consider the issue of punitive damages if the trial judge determined under the totality of the circumstances and in light of defendant's aggregate conduct, that a reasonable, hypothetical juror could have identified either malice or gross disregard to the rights of others." ***Paracelsus Health Care Corp. v. Willard***, 754 So. 2d 437, 442 (Miss. 1999) (citation omitted). Factually, we find no support that Dr. Causey acted with malice or with gross disregard for the rights of others.

¶49.    Dr. Causey submits he was treating Allen based on the belief she was a terminal patient and needed relief from pain. Allen's daughter and granddaughter testified that while Allen was at Hospice, they were pleased with the care she received and felt the staff was attentive to Allen's needs. Based on the record before this Court, there was no evidence that Dr. Causey "demonstrated a willful or malicious wrong or the gross, reckless disregard for

22

the rights of others." ***Ross-King-Walker, Inc. v. Henson***, 672 So. 2d 1188, 1192 (Miss. 1996) (citations omitted). We find clear error, in that the record is devoid of these elements, and furthermore, that punitive damages should not automatically be submitted to a jury by a trial court. Accordingly, we are required to reverse and render the award of punitive damages.

**V.      Whether the trial court erred in denying Dr. Causey's motion for remittitur.**

¶50.    The Sanders family was awarded $4,000,000 in compensatory damages and punitive damages in the amount of $500,000. By agreement of the parties, the verdict was offset by the settlement amounts of UMC and Hospice Ministries. The final verdict rendered against Dr. Causey was for the amount of $3,485,000. Subsequent to the verdict, Dr. Causey filed a Motion for Remittitur and/or to Strike Punitive Damages, which was denied by order from the trial court.

¶51.    This Court has addressed the appropriate procedure regarding remittitur in ***Dedeaux v. Pellerin Laundry, Inc.:***

> Any party aggrieved by the amount of damages awarded pursuant to a jury verdict may file a motion for an additur or remittitur. Miss. Code Ann. § 11-1-55. If the trial judge grants a motion for an additur or remittitur, such grant of an additur or remittitur shall take effect only if accepted by all the parties. If all the parties do not agree to the additur or the remittitur, then each party shall have the right to either demand a new trial on damages, or appeal the order asserting an abuse of discretion on the part of the trial judge.

***Dedeaux v. Pellerin Laundry, Inc.***, 947 So. 2d 900, 908 (Miss. 2007).

¶52.    In his Motion for Remittitur and in his brief, Dr. Causey argues there was little or no evidence put on related to damages, and that the evidence regarding Allen's life expectancy

was "speculative at best." Experts for both parties gave contrary testimony on how long Allen was expected to live. Dr. Hayne testified for Sanders that the prognosis for Allen's life expectancy was "guarded" and she could have lived several more years, even though she had other underlying diseases. Dr. Houston, testifying for Dr. Causey, stated that Allen may not have had cancer, but she was "failing to thrive" and "cachectic" and that "hospice care was appropriate for her." Two nurses who testified on behalf of Hospice stated Allen very much "appeared to be terminally ill" and in "extreme pain at all times."

¶53. The family expended $6,300 for Allen's burial expenses. The Sanders family's testimony centered on their loss of the enjoyment, society, and companionship of Allen. Additionally, the jury was instructed that the wrongful-death beneficiaries were entitled to recover for the pain, suffering, and mental anguish sustained by the decedent from the time of the occurrence of the wrongful conduct until death.

¶54. The determination of damages is within the province of the jury, and this Court has held, "[c]ompensation in a wrongful death action is not limited to actual damages and lost wages, but extends to the pain and suffering of the deceased, as well as the loss of companionship and society." *Venton*, 964 So. 2d at 506 (citation omitted). "[A] remittitur is appropriate when (1) the jury or trier of fact was influenced by bias, prejudice, or passion or (2) the damages were contrary to the overwhelming weight of the evidence." *Bolden*, 854 So. 2d at 1058 (internal citations omitted).

¶55. No evidence of either was presented to the trial court, and therefore we find no error. We reaffirm our precedent that we will "generally not vacate or reduce a damage award

24

unless it is so 'out of line as to shock the conscience of the court.'" *Id.* (citing *City of Jackson v. Locklar,* 431 So. 2d 475, 481 (Miss. 1983)).

## VI. Whether the trial court erred in not instructing the jury as to "chance of recovery."

"When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed." *Burton ex rel. Bradford v. Barnett*, 615 So. 2d 580, 583 (Miss. 1993). Similarly, this Court has stated that "in determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997) (quoting *Collins v. State*, 691 So. 2d 918 (Miss. 1997)). In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results.

*Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001).

¶56. At trial, Dr. Causey submitted a chance-of-recovery instruction which stated,

The court instructs you that Mississippi law does not permit recovery of damages because of mere diminishment of the "chance of recovery." Recovery is allowed only when the negligence of the medical provider results in the loss of a reasonable probability of substantial improvement of the plaintiff's condition. Therefore, if you find that there was no reasonable probability that Ms. Allen's condition would substantially improve, even in the absence of any negligence by the Defendants, then you must return a verdict for the Defendants.

¶57. Dr. Causey argued he was entitled to a chance-of-recovery instruction based on the contention "that she was terminal patient. And so she was sent to us to die and to die comfortably. And so if [Plaintiffs] are saying that we somehow cut short that amount of time, then they should not be allowed to recover on some theory that we, you know, cut short her life, her ability to – her chance to recover because she was terminal." Sanders objected to this

instruction, stating it was not an issue brought forth by the Plaintiff or supported by the evidence in this case. The instruction was refused by the trial court.

¶58. The trial judge appropriately stated the issues of this case, which were: a) did an overdose occur and b) was this overdose the proximate cause of Allen's death? The jury was properly instructed as to these issues. Instruction P-13 states:

> If you find from a preponderance of the evidence in this case that Ersel Allen, decedent, while a patient at Hospice Ministries, Inc. was in the care of Dr. William Causey and other employees of Hospice Ministries, Inc. was prescribed an overdose of the drug Hydromorphone or Dilaudid; and said overdosing, if any, of Ersel Allen was the sole proximate cause or a proximate contributing cause of Ersel Allen's death and damages, if any, then your verdict shall be for the plaintiffs, and you must award damages, if any, in accordance with the other instructions given to you.

¶59. Instruction 14 states,

> However, if you find from the evidence that the Plaintiffs have failed to prove to you, by a preponderance of the evidence,
>
> 1. That Dr. Causey was negligent or acts fell below the standard or care, in prescribing and having administered an overdose of pain medication to Ersel Allen by nurses while she was at Hospice Ministries *and*
>
> 2. That Dr. Causey's negligence, if any, proximately caused or proximately contributed to Ersel Allen's death and other damages, if any sustained by Ersel Allen and the Plaintiffs, then your verdict shall be for the Defendants Dr. William Causey and Hospice Ministries.

¶60. No evidence of a possibility of a substantial recovery was presented to the jury by either Plaintiff or Defendant. Dr. Causey's brief states that the evidence of recovery was speculative at best and that experts testified Allen could have lived "anywhere from an additional six weeks to seven years." Sanders's proof can be capsulized as follows: Dr.

Causey allegedly hastened Allen's death by an overdose. Dr. Causey offered evidence that Allen was terminally ill and would have died within six months regardless.

¶61. Loss-of-chance-of-recovery theory instructions are generally submitted by plaintiffs in circumstances where a medical provider's negligence does not cause a patient's injury or death, but arguably hindered the patient from achieving reasonably probable and substantial recovery from injury. In the case sub judice, Dr. Causey was alleged to have *caused* the death of Allen due to an overdose, not to have *hindered* Allen's recovery. Therefore, the chance-of-recovery instruction is not applicable in this case.

## CONCLUSION

¶62. For the reasons stated herein, we find this judgment should be affirmed as to compensatory damages and reversed and rendered as to punitive damages.

¶63. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J., AND EASLEY, J.**

**GRAVES, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶64. I agree with the majority's decision today except for its treatment of the punitive damages issue. The reasons for my disagreement have been fully explained in my dissent in *Prudential Insurance Company of America v. Stewart*, 969 So. 2d 17, 28-35 (Miss. 2007) (Graves, J., dissenting) as it relates to *Bradfield v. Schwartz*, 936 So. 2d 931 (Miss. 2006).

27

I hereby incorporate the arguments from my dissent in ***Prudential***.  ***Prudential***, 969 So. 2d

at 28-35.

**DIAZ, P.J., AND EASLEY, J., JOIN THIS OPINION.**