# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-01288-SCT

*AMFED NATIONAL INSURANCE CO.,*
*AMERICAN FEDERATED INSURANCE CO., AND*
*AMFED COMPANIES, LLC*

*v.*

*NTC TRANSPORTATION, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/27/2014 |
| TRIAL JUDGE: | HON. JEFF WEILL, SR. |
| TRIAL COURT ATTORNEYS: | JACK R. DOBSON |
| | SHAN THOMPSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ROBERT P. THOMPSON |
| | ANDY LOWRY |
| ATTORNEY FOR APPELLEE: | JASON E. FORTENBERRY |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND RENDERED - 08/11/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., KITCHENS AND KING, JJ.**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     An employee of NTC Transportation, Inc. ("NTC") filed petitions to controvert with the Mississippi Workers' Compensation Commission ("the Commission"), claiming he had suffered compensable work-related injuries on two occasions. AmFed National Insurance Co. ("Amfed")[1]—believing NTC's workers' compensation coverage to have lapsed due to

---

[1]The term "AmFed" refers collectively to all AmFed entities party to this litigation including AmFed National Insurance Company, American Federated Insurance Company, and AmFed Companies, LLC.

NTC's failure to timely pay the premium—responded and denied both liability and coverage as to the latter injury. AmFed's denial of coverage sparked the instant litigation and culminated in a judgment rendered in NTC's favor. Based on the applicable law and particular facts of this case, NTC had no insurance coverage with AmFed in effect at the time of the relevant injury. Accordingly, we reverse and render.

## FACTS AND PROCEDURAL HISTORY

¶2. NTC operates a business which provides nonemergency medical transportation services for sixteen Mississippi counties. Due to the nature of its business, NTC is unable to obtain workers' compensation coverage in the voluntary market. The Mississippi Legislature established the Mississippi Assigned Risk Plan ("the Plan") to provide access to workers' compensation insurance to businesses like NTC. AmFed is an insurance company located in Madison, Mississippi, and participates in the Plan because it is required to do so—the Plan requires all insurers who write workers' compensation coverage in Mississippi to participate.

¶3. The Plan paired NTC and AmFed—so, NTC obtained its workers' compensation coverage from AmFed beginning on January 19, 2000. NTC's policy was renewable each year thereafter, provided that NTC tendered the premium payment on or before the relevant due date. Accordingly, NTC's policy with AmFed was renewed for three years following the initial policy period until January of 2004.

¶4. On November 13, 2003—more than sixty days before the current policy was set to expire—AmFed sent a renewal notice to NTC, in which it offered to renew NTC's coverage

2

for an additional year provided that the premium payment was received on or before January 19, 2004 and the new policy, if timely renewed, would be effective January 19, 2004, through January 19, 2005. The notice indicated a policy premium of $42,347 and provided for three different installment options. The notice also included the following language: "payment *must be received by the due date* shown above *to insure no lapse* in coverage."

¶5. NTC does not dispute receipt of the sixty-date notice. AmFed contends—and NTC has not disputed—that it sent an additional renewal notice in December 2013, some thirty days before the current policy was to expire. AmFed did not send the aforementioned renewal notices to the Commission nor did AmFed personally deliver the renewal notices to NTC.

¶6. Because the premium was so expensive, NTC resorted to third-party financing—NTC obtained a loan from Premium Financing Specialists of the South ("PFS"), and PFS allegedly issued NTC a check on January 19, 2004. NTC subsequently tendered the premium check to its agent, who then mailed the check along with the corresponding stub from the renewal notice, and payment was received by AmFed on February 4, 2004—two weeks past the January 19 deadline indicated in the renewal notice. After receipt of the premium payment, Claudine Burkes ("Burkes"), AmFed's Operations and Residual Market Manager, deposited the payment and issued NTC a workers' compensation policy effective from February 4, 2004, through February 4, 2005.

¶7. Beginning in March 2004, Rhondy Mickle ("Mickle"), an NTC employee, filed two workers' compensation claims with the Commission, alleging that he had suffered compensable work-related injuries on January 16, 2004, and January 22, 2004. As a result of these injuries, Mickle filed Petitions to Controvert against NTC and AmFed with the Commission in Jackson, Mississippi. AmFed responded to the January 16, 2004, claim on behalf of NTC and denied liability but not coverage. As to the January 22, 2004 claim, AmFed—believing that the policy had lapsed—responded only on its own behalf, and denied both liability and coverage. Mickle's claims ultimately were settled, but NTC and AmFed preserved the coverage issue, which is the subject of the instant litigation.

¶8. On June 30, 2006, NTC filed suit against AmFed in the County Court of Hinds County for the First Judicial District—in its first complaint, NTC alleged claims for breach of contract and for declaratory relief. NTC filed its First Amended Complaint on November 16, 2006, adding a demand for punitive damages and prejudgment interest. AmFed responded to NTC's amended complaint on January 29, 2007, and—believing Hinds County to be an improper venue— moved for a transfer either to Rankin County or Madison County. The trial court entered an order on June 28, 2007, denying AmFed's motion without explanation.

¶9. On April 1, 2008, NTC filed a Motion for Partial Summary Judgment and asked the court to find that, as a matter of law, NTC had workers' compensation coverage in effect at the time of Mickle's injury. NTC argued that it had submitted a counteroffer for backdated coverage to AmFed when it sent in the late premium payment, which AmFed then accepted

4

by depositing the check. NTC argued in the alternative that its policy with AmFed continued in effect because AmFed failed to comply with Mississippi Code Section 71-3-77,[2] which NTC contended required AmFed personally to deliver the renewal notice to NTC and to send a copy of the renewal notice to the Commission via certified mail.

¶10. AmFed responded to NTC's motion for partial summary judgment with its own Cross-Motion for Summary Judgment on May 12, 2008. AmFed argued that, because NTC had failed to timely pay the premium amount, a lapse in coverage resulted from January 19, 2004, until February 4, 2004, and that consequently, no coverage existed at the time of Mickle's January 22, 2004, injury. AmFed further contended that Mississippi Code Section 71-3-77 did not apply to these circumstances—where a policy had expired, or lapsed, for failure to timely pay a premium.

¶11. The trial court granted NTC's motion for partial summary judgment and denied AmFed's cross-motion for summary judgment on November 20, 2008. In the order granting partial summary judgment to NTC, the trial court found as follows:

> [] . . . on January 19, 2004, AmFed's offer to renew the worker's [*sic*] compensation coverage from January 19, 2004 through January 10, 2005 expired by its own terms without acceptance from NTC;
> [] that or around February 4, 2004, AmFed accepted and deposited a check from NTC for the renewal premium of said policy, in the amount of $47,347.00 which was accompanied by the payment stub from the Notice of Renewal previously sent to NTC by AmFed; and
> [] That the payment stub submitted along with the check by NTC reflected all of the same material terms as the prior contract for insurance previously in place between the parties, including a policy period effective January 19, 2004 and continuing until January 19, 2005, but that on February 4, 2004, AmFed issued a new policy of worker's [*sic*] compensation insurance

---

[2] *See* Miss. Code Ann. 71-3-77 (Rev. 2011).

to NTC which purported to extend coverage from February 4, 2004 through February 5, 2005; and

[] That AmFed did not contact NTC prior to depositing the check, nor did AmFed take any other measures to negotiate a new or different policy period with NTC or otherwise inform NTC of the change to the coverage period reflected on the new policy.

[] This Court finds that the Parties entered into a valid, binding, and enforceable contract for worker's [*sic*] compensation insurance, which came into existence between NTC and AmFed on the date AmFed deposited NTC's premium check, and that the effective policy period of said insurance coverage was from January 19, 2004 through January 19, 2005, and that all the terms and conditions of said insurance coverage were the same as those that were reflected in the Renewal Notice sent by AmFed to NTC.

[] The Court further finds that AmFed's Renewal Notice was insufficient notification of AmFed's intent not to renew the policy for failure to timely pay premium because AmFed failed to strictly comply with the requirements of Mississippi Code Annotated § 71-3-77 by failing to personally serve NTC with the Notice or send the Notice registered or certified mail, or to serve the Notice upon the Worker's Compensation Commission within the time frame delineated by the statute.

[] Therefore, in the event that AmFed had not contracted for worker's [*sic*] compensation coverage from January 19, 2004 through February 4, 2004, the prior policy of insurance would have continued in effect because of AmFed's failure to effectively terminate NTC's worker's [*sic*] compensation coverage.

[] The Court finds that for all the reasons above, NTC had worker's [*sic*] compensation insurance coverage in effect with AmFed on January 22, 2004, and that coverage for workplace injuries sustained by NTC's employee, Rhondy Mickle, on that day were covered by said insurance. Having established liability as a matter of law, the only issues remaining for trial will be NTC's claims of bad faith denial of insurance coverage and damages.

¶12. Following this order, AmFed filed a Petition for Interlocutory Appeal with this Court on December 11, 2008. A panel composed of Carlson, P.J., Randolph and Lamar, JJ., denied AmFed's petition on January 14, 2009.

¶13. After this Court denied interlocutory review, AmFed filed a Motion for Partial Summary Judgment on NTC's claims for bad faith, punitive damages, and attorneys' fees.

6

AmFed argued that NTC could not demonstrate bad faith because AmFed had an arguable basis for denying coverage and because NTC had no evidence showing that AmFed had acted with malice, gross negligence, or reckless disregard with respect to its decision to deny coverage. According to AmFed, because NTC could not establish bad faith, neither an award of punitive damages nor attorneys' fees was warranted. The record before this Court contains no order disposing of the aforementioned motion.

¶14. The issues of bad faith and damages subsequently were addressed in a trial held on June 2, 2010. At trial, the parties presented testimony from Burkes, Robert Blacklidge, and James Hathcock. After Blacklidge's testimony, AmFed moved for a directed verdict, which the trial court granted in part and denied in part—the court granted a directed verdict in AmFed's favor on the punitive damages issue but allowed the bad faith and attorneys' fees issues to go forward. After the presentation of all evidence, AmFed again moved for a directed verdict with respect to the remaining issues, but that motion was denied. At the close of trial, the court ruled that AmFed lacked a legitimate or arguable basis for its denial of coverage such that NTC was entitled to an award of attorneys' fees expended in the coverage litigation and, on August 17, 2010, the court rendered a final judgment reflecting its ruling at trial.

¶15. Both NTC and AmFed then filed Notices of Appeal with the Hinds County Circuit Court.[3] On appeal, AmFed argued (1) that the trial court had abused its discretion in denying its motion for a transfer of venue; (2) that the trial court erred in ruling that NTC had

_____

[3] NTC originally appealed the directed verdict on the punitive damages issue but failed to pursue the argument—it did not brief the issue nor raise it via oral argument.

7

submitted a counter-offer for retroactive coverage which AmFed had accepted; (3) that the trial court erred in concluding that Mississippi Code Section 71-3-77 applied in these circumstances, and (4) that the trial court erred in finding that AmFed lacked a legitimate or arguable basis for denying coverage and in awarding attorneys' fees to NTC. The Hinds County Circuit Court entered an Order Affirming the Decision of the County Court on August 27, 2010. The circuit court found, in relevant part, as follows:

> . . . Regarding the ruling that a contract existed between AmFed and NTC for workers' compensation coverage from January 19, 2004, through February 3, 2004, this Court is in agreement with the trial court that because AmFed had "not contracted for workers' compensation coverage from January 19, 2004, through February 2004, the prior policy of insurance would have continued in effect because of AmFed's failure to effectively terminate NTC's worker's [sic] compensation coverage." . . . This Court is in agreement with the trial court that AmFed's renewal notice was "insufficient notification of AmFed's intent not to renew the policy for failure to timely pay premium because AmFed failed to strictly comply with the requirements of Miss. Code Ann. 71-3-77 by failing to personally serve NTC with the notice or to send the notice registered mail or certified mail, or to serve the notice upon the Worker's [sic] Compensation Commission within the time frame delineated by the statute."

¶16.    AmFed then timely filed its Notice of Appeal with this Court. On appeal, AmFed raises the following issues:

> I.      **Whether the county court and circuit court erred in determining that venue was proper in Hinds County, Mississippi.**
>
> II.     **Whether the county court and circuit court erred in determining that NTC had workers' compensation coverage with AmFed in effect at the time Mickle was injured on January 22, 2004.**
>
> III.    **Whether the county court and circuit court erred in finding that AmFed lacked a legitimate or arguable basis for its denial of coverage and, consequently, in awarding extracontractual damages in the form of attorneys' fees to NTC.**

8

¶17. Because the second issue is dispositive of this appeal, we decline to address the remaining two issues. Accordingly, we address below whether the trial court erred in concluding that NTC had workers' compensation coverage with AmFed in effect at the time of the relevant injury, and consequently, whether the trial court erred in denying AmFed's motion for summary judgment.

## STANDARD OF REVIEW

¶18. This Court reviews a trial court's grant or denial of a motion for summary judgment *de novo*.[4] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5] This Court must view the evidence "in the light most favorable to the party against whom the motion has been made."[6] But the party opposing summary judgment "may not rest upon mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, will be entered against him."[7]

## DISCUSSION

[4] *Lewallen v. Slawson*, 822 So. 2d 236, 237 (Miss. 2002).

[5] Miss. R. Civ. P. 56 (c).

[6] *Duckworth v. Warren*, 10 So. 3d 433, 436 (Miss. 2009) (quoting *One South, Inc. v. Hollowell*, 963 So. 2d 1156, 1160 (Miss. 2007)).

[7] Miss. R. Civ. P. 56 (e).

9

¶19. NTC asserts that it had workers' compensation coverage in effect at the time of Mickle's January 22, 2004, injury for two reasons. First, NTC argues that when it tendered a premium payment two weeks late, it had presented AmFed with a counter-offer for backdated coverage, which AmFed then accepted by depositing the payment. Second, in the alternative, NTC argues that its workers' compensation coverage with AmFed continued in effect because, according to NTC, AmFed was required to comply with, and admittedly did not comply with, the notice requirements found in Mississippi Code Section 71-3-77.

¶20. The county court accepted both these arguments while the circuit court found only the second argument to be meritorious. For reasons to be discussed below, we find both arguments to be without merit. Consequently, the trial court erred, not only when it granted NTC's motion for partial summary judgment, but also when it simultaneously denied AmFed's cross-motion for summary judgment.

     **I.     Whether NTC's premium payment—which undisputably was two weeks late—constituted a counter-offer for backdated coverage, which AmFed accepted by depositing said payment into its account thereby creating a valid and enforceable contract for a policy in effect from January 19, 2004, through January 19, 2005.**

¶21. NTC argues that when it sent in its late premium payment it had submitted a counter-offer to AmFed for backdated coverage, in particular for coverage beginning on January 19, 2004, which AmFed then accepted by depositing the premium check. We simply cannot accept such an argument.

10

¶22. "Insurance policies are matters of contract and the interpretation of insurance contracts is according to the same rules which govern other contracts."[8] Therefore, to have an enforceable insurance contract, the general contract elements must be present: offer, acceptance, and consideration.[9] Additionally, "[f]or an insurance contract to exist the minds of the parties must meet as to the terms of the contract."[10] In other words, "there must be a meeting of the minds."[11]

¶23. After acknowledging that AmFed's offer to renew NTC's coverage "expired by its own terms without acceptance from NTC," the county court went on incorrectly to find that, because "AmFed accepted and deposited a check from NTC for the renewal premium of said policy . . . which was accompanied by the payment stub from the Notice of Renewal," and because "the payment stub submitted along with the check [] reflected all of the same material terms as the prior contract for insurance previously in place between the parties, including a policy period effective January 19, 2004 and continuing until January 19, 2005," that "the [p]arties entered into a valid, binding, and enforceable contract for . . . insurance . . . and the effective policy period was from January 19, 2004, through January 19, 2005."

---

[8] *Prudential Ins. Co. of America v. Stewart*, 969 So. 2d 17, 21 (Miss. 2007) (quoting *Krebs v. Strange*, 419 So. 2d 178, 181 (Miss. 1982)).

[9] *Id.*

[10] *Id.* (quoting *Scottish Union & Nat'l Ins. Co. v. Warren Gee Lumber Co.*, 118 Miss. 740, 754–55 (1918)).

[11] *Id.* at 22.

11

In so finding, the county court emphasized that AmFed had failed to inform NTC that it had changed the coverage period to February 4, 2004, through February 4, 2005.

¶24.  We first point out that the county court erred in its characterization of this transaction. Neither the payment stub—the document the county court *believed* "reflected all of the same material terms as the prior contract for insurance previously in place"—nor the check, itself, included the original coverage dates:  January 19, 2004, through January 19, 2005.  The payment stub contained only the following information: the policy number, the agency number, the policy premium amount, the ***payment due date***, and the billing date.  Nothing on the payment stub indicates that NTC was submitting a counter-offer for backdated coverage or was requesting retroactive coverage, i.e., the coverage period originally offered by AmFed had NTC chosen to pay its premium in a timely manner.  So we must reject NTC's argument that its check accompanied with a payment stub constituted a "counter-offer" for backdated coverage.

¶25.  Also, the county court erred in finding that AmFed had failed to inform NTC that it was going to issue or that it had issued a new policy with different coverage dates.  The record indicates quite the contrary.  In her deposition testimony, Burkes testified about a conversation with NTC's agent, as follows:

> Q.  You were asked earlier whether you contacted or spoke with NTC regarding this lapse period which by my count is 17 days from the 19th of January, 2004, until you renewed the policy.  Is that correct?
> A.  (Witness shakes head affirmatively.)
> Q.  Did you speak to anybody with the agency?
> A.  I spoke with the agent.  I don't remember the date but sometime after the lapse the agent called about the status of the policy.  I told him that it had expired and he said well, I'm a premium financing lender but I

12

> guess this is going to be an ENO claim. He said I thought there was a grace period. I said no grace period on workers' comp. I guess this will be an ENO claim is what he said.

¶26. So, according to uncontradicted testimony from its operations manager, AmFed informed NTC's agent *before* NTC tendered its late premium payment that the policy had expired for failure to pay in a timely manner. Additionally, and perhaps most importantly, after AmFed received NTC's two-week late payment, AmFed issued a new policy that clearly stated the coverage period would be from February 4, 2004, through February 4, 2005. After receiving the policy, NTC made no objections to the new coverage period until *after* Mickle filed his workers' compensation claim with the Commission, and Mickle filed his first claim on March 15, 2004—almost a month and a half after AmFed had issued NTC the new policy with new coverage dates.

¶27. Furthermore, even were we to conclude that NTC believed it was submitting a counter-offer to AmFed, nothing in the record indicates that AmFed ever perceived it to be a counter-offer for retroactive coverage, nor do we find any evidence that AmFed agreed to backdate coverage. Quite the contrary, Burkes's deposition testimony and AmFed's issuance of a policy with effective dates different from those NTC's alleges that it proposed, establish, at the very least, that no "meeting of the minds" occurred—and consequently, no insurance contract *for backdated coverage* was created.

¶28. We also find it important that the Plan supports AmFed's position that it was within its prerogative to issue a policy with a gap, or lapse, in coverage for the period that the premium payment had not been paid. The Plan provides guidance for exactly the type of

13

scenario that occurred in the instant case. Rule III-3 of the Plan provides for the "effective date of policy" and states that "policies shall be . . . *renewed . . . without a lapse* in coverage *when premium is received or U.S. mail postmarked prior to the policy effective date . . . .*" This rule demonstrates that, when an insured makes an untimely premium payment, the insurer is permitted, though not required, to renew the policy with a lapse in coverage if it so chooses. And where it does so, the policy period ends on the policy's anniversary date, rather than a month later, as indicated by the policy actually issued by AmFed.

¶29. AmFed's actions also are consistent with the standard procedures contained within the Assigned Risk Supplement, a supplement to the Plan. The Supplement provides that "if the required renewal premium is *not received timely*, the policy will be issued consistent with the Reinstatement-Cancellation section [of the supplement]." According to the Reinstatement-Cancellation section, "the carrier will reinstate insurance *with a lapse in coverage*, issue a short-term policy, or take other underwriting action consistent with NCCI Basic Manual Rules."

¶30. NTC argues that, because this language is permissive and provides an insurer three options when an insured submits an untimely premium payment, that AmFed *should* have chosen to "take other underwriting action" and issue NTC a policy for backdated coverage. NTC correctly points out that the Supplement's language is permissive—but the permissive nature of the language is irrelevant. The applicable regulations clearly provided AmFed with the discretion to issue NTC a new policy with a lapse in coverage—and AmFed properly chose to exercise that discretion. In sum, we find that the trial court erred in finding that

14

NTC's late premium payment constituted a counter-offer for backdated coverage, which AmFed then accepted by depositing the check.

¶31.    We now briefly address concerns that were raised at oral argument as to whether the agent—Larry Skeen— to whom NTC tendered its premium payment- -was an agent of NTC or AmFed.  We find it important first to emphasize that neither party raised the "agency" issue in the county and circuit courts below. "This Court has repeatedly held that issues *not raised* at trial *cannot* be raised on appeal."[12]

¶32.    Moreover, the record is devoid of anything indicating that NTC was not afforded the opportunity to raise the issue or to make an argument related to the issue, when making its case for summary judgment before the lower courts or in its defense against AmFed's motion for summary judgment.

¶33.    We also find telling that, in NTC's own filings in the courts below, it described Skeen as "NTC's" agent, clearly indicating that NTC believed Skeen to be its agent and not an agent for AmFed.  Most importantly, however, is Burkes' deposition testimony.  When questioned about the relationship with Skeen, Burkes stated as follows:

> Q.    Ma'am, you talked about some conversations you had with Larry Skeen.  Is he with American Auto Insurance Agency in Greenville?
> A.    He is the agent.
> Q.    Would you have knowledge as to whether or not there was an agency agreement between American Auto Insurance Agency and either American Federate or AmFed National?
> A.    As far as assigned risk goes there are no agency agreements with any agents.

---

[12] ***Southern v. Miss. State Hosp.***, 853 So. 2d 1212, 1215 (Miss. 2003) (citing ***Parker v. Miss. Game & Fish Comm'n***, 555 So. 2d 725, 730 (Miss. 1989)) (emphasis added).

15

> Q. So Larry Skeen would not be either a general agent or a soliciting agent of any of these companies?
>
> A. Not so far as assigned risk goes.

¶34. This uncontroverted testimony demonstrates AmFed's unwavering assertion that Skeen was *not* its agent.

¶35. Finally, we find it important to note that both parties—including NTC—appeared completely unprepared to answer questions raised at oral argument concerning this issue. Both parties' counsel pointed to Burkes's testimony, indicating they believed that to be the answer. Further, they both confirmed that the issue had not been raised before the trial court. And most compelling, NTC's counsel conceded that it was not an issue nor was it making it an issue.

¶36. In sum, we decline to address the "agency" issue, as it never was presented to the courts below and the record is devoid of any indication that NTC was denied an opportunity to make that argument. Moreover, we will not address an issue *sua sponte* that, at oral argument, both parties conceded was *not* an issue before this Court.

**II. Whether the notice requirements found in Mississippi Code Section 71-3-77—in effect at the time—apply when an insurer intends to renew a policy but that policy expires by its own terms for failure to timely pay a premium.**

¶37. We now address whether NTC's coverage continued in effect due to AmFed's failure to comply with the notice requirements found in Section 71-3-77. It is undisputed that AmFed sent, and NTC received, renewal notices both sixty and thirty days prior to the policy expiration date. What is in dispute, however, is whether these renewal notices were legally sufficient—that is, whether these notices were required to comply with Section 71-3-77.

16

AmFed asserts, and we agree, that this statute does not apply to situations in which a policy expires for failure to pay a premium in a timely manner.

¶38. At the outset, we note that Section 71-3-77 was amended in 2007 and this amended version became effective from July 1, 2007, onward.[13] So, in addressing this issue, we look at the version of Section 71-3-77 in effect at the time AmFed sent these renewal notices in 2003 and the policy lapsed in 2004. At the time, Section 71-3-77 provided, in pertinent part, as follows:

> No such policy [for workers' compensation insurance] shall be *cancelled* by the insurer *within the policy period* until a notice in writing shall be given to the commission and to the assured, fixing the date on which it is proposed to *cancel* it or declaring that the company *does not intend to renew* the policy upon expiration date, such notices to be served personally or by registered mail on the commission at its offices in Jackson, and upon the assured. No such *cancellation* shall be effective until thirty (30) days after the service of such notice, unless the employer has obtained other insurance coverage, in which case such policy shall be deemed *cancelled* as of the effective date of such other insurance, whether or not such notice has been given.[14]

¶39. When presented with a question regarding the application of a statute, this Court strives to give the statute its effect as intended by the Legislature.[15] In so doing, this Court first looks to the statute's language.[16] Accordingly, "[i]f the words of a statute are clear and

---

[13] 2007 Miss. Laws ch. 366, § 1.

[14] Miss. Code Ann. § 71-3-77(1) (Rev. 2011) (emphasis added).

[15] *City of Natchez, Miss. v. Sullivan*, 612 So. 2d 1087, 1089 (Miss. 1992).

[16] *Pinkton v. State*, 481 So. 2d 306, 309 (Miss. 1987).

17

unambiguous, we apply the plain meaning of the statute and refrain from using principles of statutory construction."[17]

¶40. Based on the statute's plain language, these notice requirements do not apply unless AmFed chose to *cancel* NTC's workers' compensation coverage *within the policy period* or *did not intend to renew* NTC's policy upon its expiration. AmFed argues that "where the insurer has made its own decision that it will cancel a policy 'within the policy period,' or that it does not wish to renew the policy after it expires—in those two instances, notice of such a decision or wish" must be sent according to the requirements in the statute. Further, AmFed contends that "71-3-77 does not protect the insured from . . . the insured's own act of failing to renew its policy." According to AmFed, the statue simply is inapplicable, as it neither *cancelled* NTC's policy nor did it ever *not intend to renew* NTC's policy. We agree.

¶41. Surely it cannot be concluded, and NTC does not even attempt to argue, that AmFed's renewal proposals amounted to a "cancellation" of NTC's policy. "Cancellation as used in insurance law, means termination of a policy *prior* to the expiration of the policy period by an act of one or all the parties."[18] It is undisputed that the renewal notices sent by AmFed did not attempt to terminate NTC's workers' compensation policy prior to its expiration date.

---

[17] ***Lawson v. Honeywell Int'l., Inc.***, 75 So. 3d 1024, 1027 (Miss. 2011).

[18] ***Luedke v. Audubon Ins. Co.***, 874 So. 2d 1029, 1034 (Miss. Ct. App. 2004) (quoting ***Waynesville Sec. Bank v. Stuyvesant Ins. Co.***, 499 S.W.2d 218, 220 (Mo. Ct. App. 1973)) (emphasis added).

¶42. So, for this statute to apply, we must conclude that these renewal notices indicated that AmFed "[did] *not intend to renew* [NTC's] policy upon expiration date."[19] What actually occurred was quite the opposite. AmFed sent NTC renewal notices showing its desire to renew NTC's coverage for an additional year—nothing in the notices indicates any intent on the part of AmFed *not* to renew. As AmFed creatively characterizes it, "AmFed was willing to renew the policy, wanting to renew the policy, [and] waiting to renew the policy . . . [a]ll it needed was the renewal premium from NTC." NTC argues that the renewal notices "were insufficient notice of AmFed's intent not to renew coverage upon NTC's failure to timely pay its premium." NTC mistakenly relies on the simple fact that the policy would expire if the premium was not paid in a timely manner—but this is nothing new and is common practice in the insurance industry.

¶43. For these reasons, what transpired here did not come within the purview of the statute. What occurred in the instant case was simply a "termination" of NTC's policy as "termination refers to the expiration of the policy by lapse of the policy period."[20] It should be noted that the same practice used by AmFed in the instant case has been approved by the Commission.[21]

¶44. Based on the statute's plain language alone, the statute does not apply to the instant case. That said, we find it relevant that other jurisdictions have addressed similar issues and

---

[19] *See* Miss. Code Ann. § 71-3-77(1) (Rev. 2011) (emphasis added).

[20] *Luedke*, 874 So. 2d at 1034 (quoting *Waynesville Sec. Bank*, 499 S.W.2d at 220).

[21] *See* *Holliman v. South Miss. Sec.*, 2003 WL 22327846 (Miss. Work. Comp. Comm'n 2003).

found similar notice statutes inapplicable when a policy expires for failure to timely pay a premium on time.[22]

¶45.  The most relevant of these cases is that of *Struve Enterprises, Inc. v. Travelers Insurance Co.*, decided by the Supreme Court of Nebraska.[23]  In *Struve Enterprises*, Struve and Travelers had contracted for workers' compensation coverage for a period of one year.[24] At the close of the policy period, Travelers sent a renewal notice similar to the one at issue in the instant case and offered to renew Struve's coverage for an additional year provided the premium was timely paid.  Like the instant case, it was undisputed that Struve had received the renewal notice.[25]  Struve failed to pay the premium payment on the due date, and after the expiration of the policy, one of Struve's employees suffered a work-related injury.[26]

¶46.  Although Struve conceded it had not paid the premium in a timely manner, it nonetheless contended—and the trial court agreed—that coverage was in effect at the time

---

[22] *See* ***Adamson v. State Farm Mut. Auto. Ins. Co.***, 676 So. 2d 227, 232 (La. App. 1 Cir. 1996) (holding that ". . . when an insured purchases a policy, he is or should be aware of the term of that policy.  He has no right to expect that that policy will continue in effect until he decides to pay another premium."); ***Struve Enters, Inc. v. Travelers Ins. Co.***, 243 Neb. 516, 520 (1993) (reasoning that "the continuance of the insurer's obligation is conditional upon the payment of premiums," and holding that such notice statutes "do[] not apply to an automatic termination by expiration of the policy period."); ***Guaranty Nat'l Ins. Co. v. C de Baca***, 120 N.M. 806, (N.M. Ct. App. 1995) (explaining that "the failure of the insured to pay a renewal premium by the due date results in a lapse of coverage as of the last day of the policy period.").

[23] ***Struve Enters***, 243 Neb. 516 (1993).

[24] *Id.* at 517.

[25] *Id.* at 518.

[26] *Id.*

of its employee's injury because Travelers failed to comply with the notice requirements found in Nebraska Revised Statutes Section 44-379.[27] Section 44-379 provided, in language similar to that of the statute at issue in this case, that "the insurer shall give the insured sixty days' written notice prior to *cancellation* or *nonrenewal* of such policy . . . such notice shall state the reason for cancellation or nonrenewal."[28]

¶47.    In determining whether the statute applied, the court reasoned that "in this case, the policy simply lapsed at the end of the policy period," and "[t]he continuance of the insurer's obligation is conditional upon the payment of premiums."[29] The court further held that "the burden [is] on an insured to keep a policy in force by the payment of premiums, rather than on the insurer to exert every effort to prevent the insured from allowing a policy to lapse through a failure to make premium payments."[30] After so reasoning, the court stated it "disagreed with the district court that [Section] 44-379 require[d] Travelers to give notice of noncoverage to Struve," and instead, the court held that the statute "applies to a cancellation by the unilateral action of the insurer before the end of the policy term. . . [and] does not apply to an automatic termination *by expiration of the policy period*."[31]

¶48.    *Struve Enterprises* is directly on point with the instant case. The statute at issue in *Struve Enterprises* was applicable to cancellations and nonrenewals—Section 71-3-77 also

---

[27] *Id.* at 519.

[28] *Id.* at 520 (quoting Neb. Rev. Stat. 44-379).

[29] *Id.*

[30] *Id.*

[31] *Id.* at 520–21 (emphasis added).

applies only to cancellations and the intent not to renew. In ***Struve Enterprises***, the insured received a renewal notice similar to the one received by NTC in the present case, and just like here, the insured failed to tender a timely premium payment, resulting in the expiration, or lapse, in the policy coverage. Thus, based both on the statute's plain language and the court's analysis in ***Struve Enterprises***, we hold that Section 71-3-77, in effect at the time, does not apply to cases like the one presented here—where a workers' compensation policy expires, or lapses, for failure to pay a premium on time.

¶49. We briefly respond to NTC's argument that this Court's decision in ***Cooper v. Marathon Freight Lines, Inc.***[32] requires us to affirm. In ***Cooper***, the insurer, Commercial Union, denied coverage on Cooper's workers' compensation claim on the basis that "the policy had been 'effectively *cancelled*' by Marathon's failure to pay the renewal premium for 1988."[33] Prior to the denial of coverage, *on January 29, 1988*, Commercial Union sent Marathon a renewal quote indicating that its policy *would expire on January 25, 1988,* if the premium payment was not paid by *April 8, 1988.*[34] A little more than two months passed, and then Commercial Union sent Marathon a certified letter on April 6, 1988, notifying Marathon that "as of this date [we] have not received any monies from you . . . for the

---

[32] ***Cooper v. Marathon Freight Lines, Inc.***, 635 So. 2d 855 (Miss. 1994).

[33] ***Id.*** at 856 (emphasis added).

[34] ***Id.*** at 857.

renewal premium . . . [e]ffective 4-8-88 there is no Workers' Comp coverage in force for Marathon."[35]

¶50.  On appeal, this Court held that "neither the letter nor the renewal quote provided Marathon with effective notice of *cancellation*."[36]  In coming to its decision, this Court clearly determined that what had transpired was a "cancellation" of Marathon's workers' compensation coverage.[37]  Before concluding, this Court did mention—in what we believe to be dicta and not a holding—"assuming *arguendo*" that Commercial Union had sent Marathon a nonrenewal notice, instead of a cancellation notice, that such notice of nonrenewal must comply with Section 71-3-77.[38]

¶51.  Simply put, NTC's reliance on **Cooper** is misplaced.  In **Cooper**, the insurer essentially had renewed coverage for an additional period of more than two months, or at least implied it had renewed coverage, after the policy expired.  It sent a renewal notice four days *after* the policy was set to expire and then required that payment be received by April 8, 1988, otherwise the policy would be *cancelled* as of January 25, 1988. Further, by virtue of its certified letter sent on April 6, 1988, after Commercial Union already had implied that coverage had been extended, it was choosing to "cancel" Marathon's coverage within the newly extended policy period.

---

[35] *Id.*

[36] *Id.* at 858 (emphasis added).

[37] *Id.* at 859–61.

[38] *Id.* at 860.

¶52. Suffice it to say that the facts in *Cooper* differ greatly from those of the instant case, where AmFed sent NTC renewal notices sixty and thirty days *in advance* of the policy expiration date. Furthermore, this Court's language in *Cooper* unequivocally explained that the case concerned a *cancellation* of workers' compensation coverage—it is uncontroverted that AmFed did not cancel NTC's coverage. And while the Court did reason briefly that the statute would apply equally to instances of "non-renewal," we believe such language to have been dicta and not a holding that the Court is required to follow. But, even if it were viewed by the Court as a holding, it still would not apply to the instant case. As explained above, AmFed did not evince an intent not to renew NTC's coverage; rather it invited NTC to renew. It was NTC that dropped the metaphorical ball by failing to pay the premium in a timely manner.

¶53. In sum, what occurred in the instant case cannot properly be characterized as a cancellation of NTC's workers' compensation coverage, nor did AmFed manifest that it did not intend to renew NTC's policy. Instead, NTC's policy simply expired and its coverage lapsed for its own failure to pay its premium on time. Accordingly, the notice requirements found in Section 71-3-77 do not apply.

## CONCLUSION

¶54. We conclude that neither of NTC's arguments regarding coverage can prevail. Consequently, the county court erred in granting summary judgment to NTC, and the circuit court erred in affirming. NTC failed to establish that it had coverage in effect at the time of the relevant injury. But most importantly, NTC failed to show the existence of a genuine

issue for trial. As a result, we hold that AmFed's motion for summary judgment should have been granted. As a determination on this issue disposes of this case, we reverse both the decisions of the circuit court and county court, and render judgment in AmFed's favor.

¶55. **REVERSED AND RENDERED**.

**RANDOLPH, P.J., LAMAR, KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. WALLER, C.J., NOT PARTICIPATING.**